# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 13-20564

United States Court of Appeals
Fifth Circuit

**FILED**

March 18, 2015

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff–Appellee,

versus

JUSTIN ORTIZ,

Defendant–Appellant.

Appeal from the United States District Court
for the Southern District of Texas

Before HIGGINBOTHAM, SMITH, and GRAVES, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Justin Ortiz pleaded guilty of conspiracy to make false statements in connection with the acquisition of a firearm, *see* 18 U.S.C. §§ 371, 922(a)(6), reserving the right to appeal the denial of his motion to suppress. He claims that evidence seized from his vehicle should have been suppressed because agents of the Bureau of Alcohol, Tobacco, and Firearms ("ATF") stopped him without reasonable suspicion and that statements he made to the agents should have been suppressed because they were obtained in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966). We affirm.

No. 13-20564

I.

In July 2010, Ortiz and Jose Diaz-Meza visited a Houston gun store called SOG Armory ("SOG") and spoke with employees Joshua Hernandez and Kyle Wright about purchasing a .50-caliber rifle. They showed him a Beowulf rifle, which he decided to buy. He completed the required ATF Form 4473, which warned it was illegal to purchase for someone else, and paid about $2,100 in cash. He bought one box of ammunition. After Hernandez showed Ortiz a second rifle of the same model, he decided to buy that one too and left the store to get more cash from an ATM.

SOG employees were trained to identify straw purchases, and several aspects of the transaction had made Hernandez suspicious. At the suppression hearing, he described his concerns: First, after buying the first rifle, Ortiz asked, "How many more do you have?" Second, he paid for the first one in cash, and after deciding to buy the second, he "insist[ed]" on getting more cash from an ATM even though Hernandez told him SOG accepted credit and debit cards. Hernandez found that particularly suspicious because he believed that Ortiz could have paid for the second rifle using the same debit card he used to get cash. Third, the rifles were sold without sights, but Ortiz seemed uninterested in buying sights despite Hernandez's efforts to sell them.[1] Fourth, Ortiz bought only one box of ammunition even though Hernandez believed that Ortiz likely needed more ammunition to sight the two rifles, and SOG is the only store in Houston that sells ammunition for Beowulf rifles.[2]

---

[1] On cross-examination, Hernandez acknowledged that he had not asked whether Ortiz already owned sights and that it may have been possible to transfer the sights from another gun.

[2] On cross-examination, Hernandez recognized that in general it is possible to sight a gun with fewer rounds if one has a bore sighter, but he did not say whether it would have been possible to sight the two rifles with one box of ammunition.

2

No. 13-20564

After Ortiz and Diaz-Meza had left the store, Hernandez called ATF Agent Tommy Gray and described his concerns. Gray agreed the behavior was suspicious and asked Hernandez to stall the men because no agents were nearby. Gray called Agent Vu-Hai Phan and told him an employee of SOG had reported a suspected straw purchase. Gray repeated the specific concerns Hernandez had identified. Phan and his partner, Peter Milligan, began driving to SOG in separate vehicles.

While Milligan and Phan were on their way, Ortiz and Diaz-Meza returned with the cash, and Ortiz paid for the second rifle and completed another Form 4473. As requested, Hernandez stalled Ortiz and Diaz-Meza. He also provided Gray with Ortiz's license plate number and a description of his vehicle, information Gray conveyed to Phan and Milligan. Once Milligan and Phan arrived, they set up surveillance in the parking lot.

Milligan watched Ortiz and Diaz-Meza leave the store and saw Ortiz place two rifle bags in the rear hatch of his vehicle. Based on his experience investigating straw purchases, Milligan believed that they would go directly to the "orchestrator," who arranges a straw purchase, and he and Phan decided to follow them. The agents tailed Ortiz and Diaz-Meza for approximately an hour; Milligan observed "that the driver was making several dangerous lane changes, several U-turns. We also witnessed the passenger on the cellphone the whole time, and also witnessed him kind of pointing out directing the driver on where to go." Milligan thought Ortiz's driving was consistent with a "heat run," unpredictable driving designed to detect police surveillance and to make it more difficult for officers to follow. Milligan and Phan decided "to get the firearms secured as soon as possible" instead of continuing to follow.

Milligan then saw Ortiz and Diaz-Meza stop at a gas station near one of the pumps; Ortiz stayed in his vehicle rather than exiting to get gas. Phan

3

No. 13-20564

entered the parking lot and stopped to the back left of Ortiz's vehicle, activated his emergency lights, got out of his vehicle, and drew his gun. Milligan arrived a few seconds later and did the same, stopping to the front left of Ortiz's vehicle and displaying a neck badge. Milligan and Phan told Ortiz to turn off his engine, get out, hold his hands out to the side, and walk toward the front of his vehicle. They told Diaz-Meza to get out and walk toward the back.

Milligan approached Ortiz with his gun drawn, but, after seeing no "immediate threats," holstered it. Milligan explained he drew his weapon for safety reasons because Ortiz and Diaz-Meza had just purchased the rifles and may have already been armed. Milligan did not remember exactly how long he and Phan had their weapons drawn, but it was a matter of "minutes."

When Milligan began speaking to Ortiz, he told him either "You're not under arrest right now" or "You're not under arrest." He said the agents had been following Ortiz and Diaz-Meza and had questions about the rifles. In response, Ortiz claimed he had purchased them for his birthday. After Milligan indicated he investigates those who purchase guns for others, Ortiz changed his story and admitted he had purchased the rifles for someone else. Ortiz made that statement five to ten minutes after stopping at the gas station.

At this point, several other agents arrived. Agent Ben Smith decided to frisk Ortiz after learning Milligan had not done so. Smith told Ortiz he was not under arrest, explained what he was doing, handcuffed Ortiz, and frisked him. Smith did not unhandcuff Ortiz immediately after frisking him. Agent Roland Balesteros instructed Smith to unhandcuff Ortiz before the agents spoke with him again; Milligan and Smith did so. Ortiz was handcuffed for five to ten minutes and was not asked any questions while handcuffed.

Milligan then asked Ortiz to get into Balesteros's vehicle with Milligan and Balesteros. Milligan believed they said "something along the lines of 'Can

you get in the vehicle so we can further discuss what we've already talked about.'" Milligan testified that it was hot and was much cooler inside the car, but he did not explicitly say the temperature was the reason for getting into the vehicle. Balesteros sat in the driver's seat, Milligan was in one of the back seats, and Ortiz sat either in the front passenger seat or in the other back seat.

Once inside, Ortiz answered more detailed questions about his purchase. Milligan wrote a statement based on Ortiz's answers. Ortiz read, made corrections to, and signed, the statement. In Milligan's view, Ortiz "seemed calm and he was being extremely cooperative." It is uncertain how the agents ended the interview. Milligan denied using the phrase "You're free to go," and answered yes to the court's question "[So] you basically told him to get out [of the] vehicle?" Ortiz and the agents were in the car for twenty to forty minutes.

After they exited the vehicle, Ortiz asked Milligan whether he could smoke a cigarette. Milligan responded, "Yes, you can. Obviously we're in the middle of a gas station. You're going to have to go away from the gas," and Ortiz walked closer to the highway to smoke. Ortiz still had his phone and could have made calls. After smoking, Ortiz walked back to the agents.

Milligan opened the hatch of Ortiz's vehicle using the keys and seized the rifles because he believed the sale had been a straw purchase based on Hernandez's tip and Ortiz's and Diaz-Meza's statements. He had obtained the keys from an unspecified other agent but was unsure when that agent took the keys. Ortiz eventually got his keys back, but the record does not specify when.

Ortiz, Diaz-Meza, and the agents then went to a restaurant adjacent to the gas station to eat lunch. Milligan did not remember how he asked Ortiz to go inside. He did not say, "Would you like to have lunch with me?," but he may have said, "Let's go inside." His testimony suggested that one of the agents paid for Ortiz's lunch with his own personal funds but was unclear on that

No. 13-20564

point.  During the lunch, the agents continued talking to Ortiz and Diaz-Meza but focused on Diaz-Meza.  While they were inside, Agent Wade Brown arrived.  Brown had a "grizzly" appearance and looked like a tow-truck driver, and Ortiz became concerned the agents were going to tow his vehicle, but they assured him they did not intend to do so.

After lunch, some of the agents left with Diaz-Meza to go to the orchestrator's house.  They were gone for about thirty minutes, during which time Ortiz and his vehicle remained at the gas station.  Ortiz left after the agents returned.  He did not receive *Miranda* warnings at any point that day.

## II.

At the suppression hearing, the court found Hernandez and Milligan credible and made three rulings.  First, it decided there was reasonable suspicion to stop Ortiz based on Hernandez's tip, Ortiz's erratic driving, and the fact that Milligan saw Ortiz put the rifle bags in his vehicle.  Second, it concluded that the facts that Milligan and Phan drew their weapons upon arrival and that Ortiz was briefly handcuffed did not convert the stop into an arrest, so no *Miranda* warnings were required when Ortiz made his statements.  Third, the court ruled there was probable cause to seize the rifles based on Hernandez's tip and Ortiz's and Diaz-Meza's statements.  Accordingly, the court denied Ortiz's motion to suppress.

## III.

Where a district court has denied a motion to suppress evidence, we review its factual findings for clear error and its conclusions of law *de novo*.  *United States v. Pack*, 612 F.3d 341, 347 (5th Cir.), *modified on denial of reh'g*, 622 F.3d 383 (5th Cir. 2010).  "A finding is clearly erroneous only if the court is left with a definite and firm conviction that a mistake has been committed."

No. 13-20564

*United States v. Scroggins*, 599 F.3d 433, 440 (5th Cir. 2010). "The clearly erroneous standard is particularly deferential where 'denial of the suppression motion is based on live oral testimony . . . because the judge had the opportunity to observe the demeanor of the witnesses.'" *Id.* (omission in original) (quoting *United States v. Gibbs*, 421 F.3d 352, 357 (5th Cir. 2005)). "In addition to deferring to explicit . . . factual findings, the court must view the evidence 'most favorably to the party prevailing below, except where such a view is inconsistent with the trial court's findings or is clearly erroneous considering the evidence as a whole.'" *Id.* (quoting *United States v. Shabazz*, 993 F.2d 431, 434 (5th Cir.1993)). "The district court's ruling should be upheld 'if there is any reasonable view of the evidence to support it.'" *Id.* (quoting *United States v. Gonzalez*, 190 F.3d 668 (5th Cir. 1999)).

IV.

Ortiz urges that the rifles seized from his vehicle should have been suppressed. He theorizes that the agents lacked reasonable suspicion to stop him and because there was no legal basis to search.

A.

The reasonableness of a stop is evaluated under the two-step inquiry established in *Terry v. Ohio*, 392 U.S. 1 (1968). "First, we determine whether stopping the vehicle was initially justified by reasonable suspicion. Second, we evaluate whether the officer's actions were reasonably related in scope to the circumstances that justified the stop." *United States v. Powell*, 732 F.3d 361, 369 (5th Cir. 2013), *cert. denied*, 134 S. Ct. 1326 (2014).

> Our assessment of reasonable suspicion is based on the totality of the circumstances. Furthermore, reasonable suspicion can vest through the collective knowledge of the officers involved in the search and seizure operation. The collective knowledge theory for reasonable suspicion applies so long as there is "some degree of communication" between the

7

acting officer and the officer who has knowledge of the necessary facts. Reasonable suspicion can be formed by a confidential informant's tip so long as the information is marked by "indicia of reliability." In *United States v. Martinez*, 486 F.3d 855, 861 (5th Cir. 2007), we discussed a number of the factors applied in determining whether a tip provides reasonable suspicion, including: "the credibility and reliability of the informant, the specificity of the information contained in the tip or report, the extent to which the information in the tip or report can be verified by officers in the field, and whether the tip or report concerns active or recent activity, or has instead gone stale."

*Id.* at 369–70 (citations omitted).

There was reasonable suspicion of illegal activity based on Hernandez's tip. False statements in connection with the acquisition of a firearm are illegal, 18 U.S.C. § 922(a)(6), and the information provided to Milligan and Phan suggested Ortiz had lied on the Forms 4473 by indicating he was not purchasing the rifles for someone else. Hernandez's tip provided a basis for reasonable suspicion that Ortiz had made a false statement because the *Martinez* factors were present.

Hernandez was a credible and reliable informant. He had worked at SOG for a year and eight months at the time and had training on identifying straw purchases. There was no reason to suspect he had an ulterior motive in reporting the transaction. The information in the tip was specific. Hernandez described four suspicious aspects of Ortiz's behavior: his question "How many more do you have?," his insistence on paying in cash, his decision not to buy sights, and his purchase of only one box of ammunition. Milligan and Phan verified some of Hernandez's information. They saw Ortiz place the rifle bags in his vehicle, which had the license plate number and description indicated in the tip, confirming that Ortiz was the person in question. They also observed Ortiz's erratic driving, which indirectly corroborated Hernandez's information. And Hernandez's report was about ongoing activity and had not gone stale.

No. 13-20564

Ortiz contends none of the aspects of the transaction that concerned Hernandez suggested anything suspicious.  He is incorrect.  First, he says his question "How many more do you have?" was not suspicious, because "[v]irtually all of SOG Armory's customers buy more than one gun."  That may be true, but Ortiz's question was suspicious because it indicated an interest in buying several rifles of the same model.  Such a transaction is likely far less common, so it was appropriate for the agents to reason that Ortiz's question suggested a straw purchase.

Second, Ortiz asserts that his insistence on paying in cash was not suspicious.  He explains, "Cash purchases are common at SOG Armory; Ortiz could not have paid with an ATM card if he wanted to as the size of the purchase exceeded his daily limit."  But Hernandez was not suspicious of Ortiz merely because he paid in cash.  The unusual aspect of Ortiz's behavior was that he "insist[ed]" on going to the ATM to get more cash even though Hernandez believed he could have used the same debit card in the store.  Although many customers may prefer to use cash to protect their privacy or for other legitimate reasons, Ortiz's behavior was unusual enough that it provided part of the basis for reasonable suspicion, even if paying in cash alone would not have been sufficient.[3]  Ortiz's allegations about the limits on his debit card are immaterial.  What matters is what the agents reasonably believed about the information they received, and because debit cards often have higher purchase limits than cash-withdrawal limits, it was sensible for them to conclude that Ortiz's behavior indicated illegal activity.

Third, Ortiz submits that his decision not to buy sights was not suspicious because it would have been possible to transfer the sights from

---

[3] *See Powell*, 732 F.3d at 369 ("Our assessment of reasonable suspicion is based on the totality of the circumstances.").

another gun.  As with his insistence on paying in cash, however, that fact provided part of the basis for reasonable suspicion even though it is not always associated with illegal activity.  Hernandez's testimony implied customers typically buy sights with the Beowulf rifle,[4] and combined with the other factors, Ortiz's decision not to do so suggested he was buying for someone else.

Fourth, Ortiz says his purchase of only one box of ammunition was not suspicious.  He notes that "[b]ullets are very cheap; it is not at all uncommon for the purchaser of a new gun to have some already."  But Hernandez testified that the Beowulf rifle uses a special round and that SOG is the only store in Houston that sells it.  Thus, unless Ortiz already owned a Beowulf rifle, he probably would not have had ammunition, making his purchase of only one box unusual.

Separately from his criticisms of the basis for reasonable suspicion, Ortiz alleges Milligan never learned the details of Hernandez's tip and instead heard only the "conclusory assertion that reasonable suspicion was floating in the miasma."  He is wrong on the law and the facts.  "Under the collective knowledge doctrine, it is not necessary for the arresting officer to know all of the facts amounting to probable cause, as long as there is some degree of communication between the arresting officer and an officer who has knowledge of all the necessary facts."  *United States v. Ibarra*, 493 F.3d 526, 530 (5th Cir. 2007).  In this case, though, application of the collective-knowledge doctrine is unnecessary—the record establishes that Milligan knew the details.  Hernandez described his concerns to Gray, Gray conveyed that information to Phan, and Phan passed it on to Milligan.  Contrary to Ortiz's suggestion, Milligan

---

[4] Hernandez agreed it would be "essential" to buy sights with the rifle.  *See Shabazz*, 993 F.2d at 434 ("The evidence is viewed most favorably to the party prevailing below, except where such a view is inconsistent with the trial court's findings or is clearly erroneous considering the evidence as a whole.").

No. 13-20564

confirmed he heard the specifics, not just a general statement that there was reasonable suspicion.

In short, Hernandez's tip provided reasonable suspicion for the stop, satisfying the first step of the *Terry* inquiry.  Ortiz does not challenge the length of the stop, so there is no issue as to the second step, "whether the officer's actions were reasonably related in scope to the circumstances that justified the stop." *Powell*, 732 F.3d at 369.  Therefore, the stop was lawful.

B.

Even though the agents had properly stopped Ortiz, they still needed a legal basis to search his vehicle.  Ortiz offers only a conclusionary statement that there was none, so our discussion is brief.  "The Fourth Amendment generally requires police to secure a warrant before conducting a search." *Maryland v. Dyson*, 527 U.S. 465, 466 (1999) (per curiam).  The most relevant exception to the warrant requirement is the automobile exception, which "allows police to search a vehicle if they have probable cause to believe that the vehicle contains contraband." *United States v. Fields*, 456 F.3d 519, 523 (5th Cir. 2006).  Like reasonable suspicion, "[p]robable cause is determined by examining the totality of the circumstances." *Id.*

The agents did not have a warrant, but the automobile exception applied.  Ortiz's statements provided probable cause for the search.  In his oral statements, Oritz acknowledged he had bought the rifles for someone else.  In his written affidavit, he admitted making a straw purchase in greater detail.  As a result, the search was valid, and the district court did not err by declining to suppress the rifles seized from his vehicle.

V.

Ortiz claims that the oral statements he made to Milligan when he first

11

stopped at the gas station and the oral and written statements he made while in Balesteros's vehicle were the products of custodial interrogation. Because he did not receive *Miranda* warnings before to making them, he explains, those statements should have been suppressed.

In general, "the prosecution may not use statements . . . stemming from custodial interrogation of the defendant unless" the defendant has first been given *Miranda* warnings. *Miranda*, 384 U.S. at 444.

> Custodial interrogation is questioning initiated by law enforcement officers after a person has been taken into custody. A suspect is "in custody" for *Miranda* purposes when placed under formal arrest or when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest. Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave. The requisite restraint on freedom is greater than that required in the Fourth Amendment seizure context. The critical difference between the two concepts is that custody arises only if the restraint on freedom is a certain degree—the degree associated with formal arrest.

> Whether a suspect is "in custody" is an objective inquiry that depends on the "totality of circumstances." The subjective views harbored by either the interrogating officers or the person being questioned are irrelevant. The reasonable person through whom we view the situation must be neutral to the environment and to the purposes of the investigation—that is, neither guilty of criminal conduct and thus overly apprehensive nor insensitive to the seriousness of the circumstances.

> Recognizing that no one fact is determinative, this court has repeatedly considered certain key details when analyzing whether an individual was or was not in custody. Important factors include: (1) the length of the questioning, (2) the location of the questioning, (3) the accusatory, or non-accusatory, nature of the questioning, (4) the amount of restraint on the individual's physical movement, [and] (5) statements made by officers regarding the individual's freedom to move or leave.

*United States v. Wright*, 777 F.3d 769, 774–75 (5th Cir. 2015) (alterations, cita-tions, and internal quotation marks omitted).

It is undisputed that Ortiz was neither formally arrested nor given *Mir-anda* warnings, so the only issue is whether he was otherwise "in custody." Two recent decisions involving similar considerations but different outcomes guide our analysis and show he was not.

In *Wright*, the police obtained a warrant to search Wright's house after their investigation revealed that an IP address associated with him may have been used to share child pornography. Twelve armed officers wearing bullet-proof vests or raid jackets arrived at the house to execute the warrant. Six officers formed a perimeter around the house to prevent anyone from leaving without permission, while the other six knocked and announced and then entered with their guns drawn, forcing the seven occupants, some of whom were wearing pajamas, to exit the residence. While the search of the house was ongoing, one officer told Wright he wanted to speak with him. The officer escorted Wright to his bedroom so that Wright could change clothes, and two other officers were also there as he dressed. The officer then took him to an unmarked patrol car in the parking lot of a neighboring church, telling him on the way that he was not under arrest and was free to leave. Wright sat in the front passenger seat of the car and closed the door, and one officer sat in the driver's seat and another in the back seat. Before beginning the interview, an officer turned on a recorder, showed Wright a copy of the search warrant, and again told Wright he was not under arrest and was free to leave. The officer then read Wright his *Miranda* warnings, explained the nature of the investi-gation, and asked him questions. The interview lasted just over one hour, during which time Wright made three statements that possibly constituted requests for a lawyer. *Id.* at 771–72. We held that Wright was not in custody,

13

No. 13-20564

so admitting evidence from the interview did not violate *Miranda* even if he had asked for a lawyer, a question we did not decide. *Id.* at 777.

In *United States v. Cavazos*, 668 F.3d 190 (5th Cir. 2012), the police obtained a warrant to search Cavazos's house based on evidence that he had been texting sexually explicit material to a minor girl. Officers arrived and began banging on the door and shining flashlights into the window. When Cavazos's wife opened the door, approximately fourteen officers entered, and some of them ran into Cavazos's bedroom and handcuffed him as he was getting out of bed. After Cavazos put on pants, the officers escorted him to the kitchen while they took his wife and children to the living room. Two officers uncuffed Cavazos and sat with him for about five minutes while other officers searched the house. An officer then asked Cavazos whether there was a private room where they could speak, and they went to his son's bedroom as he suggested. Cavazos sat on the bed with two officers in chairs facing him. They left the door closed at Cavazos's request and informed him that the interview was "non-custodial" and that he was free to get something to eat or drink or use the bathroom. The officers then began questioning him without giving *Miranda* warnings. During the interview, the officers allowed Cavazos to use the bathroom, but they searched it first and observed him through the partially open door. They allowed him to go to the kitchen to wash his hands because the bathroom sink was broken, but an officer accompanied him. On several occasions, the officers interrupted the interview to obtain clothing for Cavazos's children; an officer would ask Cavazos for an article of clothing, which he would retrieve from a drawer and hand to the officer. The officers also allowed Cavazos to call his brother, who was his supervisor at work, to say he would be late, but they told him to hold the phone so they could hear the call. The interview lasted for over an hour, "and the agents' conduct was always amiable and

14

non-threatening." *Id.* at 192. We held that Cavazos was in custody, so admitting his statements violated *Miranda*. *Id*. at 194–95.

*Wright* distinguished *Cavazos* on two main grounds: First, the officers in *Wright* told the suspect he was "free to leave" and "wasn't under arrest." *Wright*, 777 F.3d at 776. By contrast, the officers in *Cavazos* told the suspect the interview was "non-custodial," an ambiguous statement that may not indicate to a layperson that he is free to leave. *Id.* (citing *Cavazos*, 668 F.3d at 195). Second, the officers in *Wright* did not immediately single out the suspect and never handcuffed him. *Id.* at 776 n.3. In *Cavazos*, the officers immediately ran to the suspect's bedroom and handcuffed him, although they uncuffed him before beginning the interview. *Id.* at 776 (citing *Cavazos*, 668 F.3d at 194).

This case falls neatly between *Wright* and *Cavazos* on both of these dimensions. Milligan and Smith told Ortiz he was not under arrest, but they did not explicitly tell him he was free to leave. Unlike the "non-custodial" statement in *Cavazos*, their statements would suggest to a reasonable person that he was free to leave, but they are less clear than the statements in *Wright*, which answered the question directly.[5]

The same is true of the extent to which the agents singled out and handcuffed Ortiz. Milligan immediately singled out Ortiz, but the agents did not cuff him until later, when they decided to frisk him. Unlike the immediate singling-out and handcuffing in *Cavazos*, that approach indicated that the purpose of the encounter was to speak with Ortiz, not to arrest him, but the fact that the agents eventually handcuffed him would suggest to a reasonable

---

[5] *See United States v. Hargrove*, 625 F.3d 170, 180 (4th Cir. 2010) (explaining that a statement that a suspect is not under arrest is entitled to some weight but is less significant than a statement that he is free to leave).

person that he was not free to leave.[6]

Most of the other factors are similar in this case, *Wright*, and *Cavazos*, so they provide only limited information about whether Ortiz was in custody. To begin with, the location of the questioning in this case and in *Wright* was an unmarked police car in a public place, *Wright,* 777 F.3d at 771, while in *Cavazos*, it was a room in the suspect's home, *Cavazos*, 668 F.3d at 192. The fact that an interview takes place in a public location weighs against the conclusion that a suspect is in custody,[7] and the same is true of an interview in a suspect's house.[8] Next, the questioning was not accusatory in any of the cases.[9]

In addition, aside from the brief handcuffing here and in *Cavazos*, which we have already discussed, there is insufficient information to determine whether the amount of restraint on the suspect's physical movement was different in those respective cases. Ortiz had his phone and could have made calls, but there is no indication whether the agents would have monitored them,[10] while the suspect in *Cavazos* could eat or drink, use the bathroom and wash his hands, and call his brother with police supervision. *Cavazos*, 668 F.3d at 192. There was no mention of whether there were similar restrictions in *Wright*. Thus, this factor does not provide a basis for distinctions.

---

[6] *See United States v. Bengivenga*, 845 F.2d 593 (5th Cir. 1988) (en banc) ("The awareness of the person being questioned by an officer that he has become the 'focal point' of the investigation, or that the police already have ample cause to arrest him, may well lead him to conclude, as a reasonable person, that he is not free to leave, that he has been significantly deprived of his freedom . . . ." *Id.* at 597 n.16 (emphasis omitted) (quoting Yale Kamisar, *"Custodial Interrogation" within the Meaning of* Miranda, *in Criminal Law and the Constitution* 355, 371 (Inst. for Continuing Educ. ed. 1968))).

[7] *Berkemer v. McCarty*, 468 U.S. 420, 438 (1984).

[8] *United States v. Fike*, 82 F.3d 1315, 1325 (5th Cir. 1996), *overruled on other grounds by United States v. Brown*, 161 F.3d 256 (5th Cir. 1998) (en banc).

[9] *Wright*, 777 F.3d at 777; *Cavazos*, 668 F.3d at 192.

[10] The agents allowed Ortiz to walk away to smoke, but that is of limited relevance because it occurred after he made the statements in question.

No. 13-20564

Finally, the number of officers was similar in all three cases. There were eventually seven agents with Ortiz at the gas station, but only one or two were questioning him at a given time. In *Wright*, there were seventeen to nineteen officers on the scene, with two questioning the suspect, *Wright*, 777 F.3d at 771, 777, while in *Cavazos* there were about fourteen officers on the scene, with two questioning the suspect, *Cavazos*, 668 F.3d at 192.

Two other considerations distinguish this case from *Wright* and *Cavazos* and show that Ortiz was not in custody. The first is the manner in which Ortiz was detained. Milligan and Phan initially stopped him at a gas station, and except for the fact that they briefly displayed their guns, the circumstances were similar to those of an ordinary traffic stop, a situation in which a suspect is not in custody. *McCarty*, 468 U.S. at 440. Moreover, Ortiz was near his vehicle[11] and had his keys,[12] so he had a readily available means to leave, a fact that is highly relevant to whether a reasonable person would have felt free to depart.[13] By contrast, the suspects in *Wright* and *Cavazos* were detained in

---

[11] Ortiz alleges that his vehicle was blocked in by the agents' vehicles, but that is not supported by the record. Milligan testified that he and Phan parked to the left of Ortiz's vehicle and that Ortiz "could have pulled forward" because the agents' cars were not blocking his path. Ortiz relies on a picture showing a black pickup behind his vehicle, but Milligan said Ortiz could have pulled *forward*, and there is nothing to indicate whether that picture was taken before or after Ortiz made the statements in question.

[12] The agents took Ortiz's keys at some point during the encounter, but Milligan could not remember when that occurred. Because we are reviewing the denial of a motion to suppress, we must evaluate the evidence in the light most favorable to the government. *Scroggins*, 599 F.3d at 440. Accordingly, we must assume the agents took Ortiz's keys after he made the statements in question.

[13] *See Morris v. Thaler*, 425 F. App'x 415, 422 (5th Cir. 2011) (per curiam) (noting that suspect "in all likelihood was in custody at the time of the interrogation" in part because officer physically blocked door); *United States v. Montos*, 421 F.2d 215, 223 (5th Cir. 1970) (suggesting that fact that postal inspector's car blocked employee's exit was relevant to whether he was in custody); *see also, e.g.*, *United States v. Maldonado*, 562 F. App'x 859, 861 (11th Cir. 2014) (per curiam) (listing fact that postal inspectors blocked in employee's mail truck as factor suggesting she was in custody); *United States v. Castillo-Martinez*, 451 F. App'x 615, 618–19 (8th Cir. 2012) (per curiam) (holding that suspect was not in custody,

raids on their houses.[14]  In *Wright*, there were initially twelve officers wearing bulletproof vests and/or raid jackets who divided themselves into perimeter and entry teams, *Wright*, 777 F.3d at 771, while in *Cavazos*, there were initially approximately fourteen officers banging on the door and shining flashlights into the window, *Cavazos*, 668 F.3d at 191–92.  Although more agents soon arrived on the scene in this case, a reasonable person detained in the manner that Ortiz was would be more likely to feel free to leave compared to a person detained in the manner that Wright and Cavazos were.

The second consideration is the length of the interview.  Construing the evidence in the light most favorable to the government, Ortiz had been stopped for thirty minutes when he exited Balesteros's car, twenty of which were in the vehicle.[15]  In *Wright*, the interview lasted about an hour, *Wright*, 777 F.3d at 771, and in *Cavazos*, it lasted over an hour, *Cavazos*, 668 F.3d at 192.  Accordingly, the length of the interview further suggests Ortiz was not in custody.[16]

To summarize, many of the factors bearing on whether a suspect is in custody are similar in this case, *Wright*, and *Cavazos*.  Milligan's and Phan's statements that Ortiz was not under arrest and the fact that the agents singled him out immediately but did not handcuff him until later provide some basis for distinguishing this case from *Cavazos*, but the facts are not as persuasive

---

in part because officers did not block his exit); *United States v. Craighead*, 539 F.3d 1073, 1086 (9th Cir. 2008) (holding that suspect was in custody in part because officer blocked his exit); *Coomer v. Yukins*, 533 F.3d 477, 486 (6th Cir. 2008) (listing fact that police cars blocked suspect's vehicle in driveway as factor suggesting she was in custody).

[14] *Wright*, 777 F.3d at 771; *Cavazos*, 668 F.3d at 191.

[15] Milligan testified that five to ten minutes after Milligan arrived at the gas station, Ortiz admitted he had purchased the rifles for someone else and that Ortiz was handcuffed for five to ten minutes before he got into Balesteros's vehicle and was in the vehicle for twenty to forty minutes.

[16] *See United States v. Harrell*, 894 F.2d 120, 124 n.1 (5th Cir. 1990) ("[A] detention of approximately an hour raises considerable suspicion.").

as those in *Wright*, where the suspect was told he was free to leave, was not singled out at the beginning of the encounter, and was never handcuffed. Nevertheless, the parallels between Ortiz's detention and an ordinary traffic stop, and the shorter length of the interview differentiate this case from both *Wright* and *Cavazos*.

Considering the totality of the circumstances, and reviewing the record in the light most favorable to the government, we conclude that Ortiz was not in custody when he made the statements in question. Consequently, no *Miranda* warnings were required, and the district court did not err by declining to suppress the statements.

AFFIRMED.

* * * * *

No. 13-20564

JAMES E. GRAVES, JR., Circuit Judge, concurring in part and dissenting in part:

I concur in the majority's opinion that neither the rifles nor Ortiz's first oral statement should be suppressed. However, I dissent from the majority's holding admitting Ortiz's second oral statement and written statement, which were both made during the questioning inside the agent's car. In these statements, Ortiz answered more detailed questions about his purchase of the rifles and admitted making a straw purchase in exchange for money. In my view, these statements were obtained in violation of *Miranda* and should be suppressed.

As the majority states, it is well-settled that the "the prosecution may not use statements . . . stemming from custodial interrogation of the defendant unless" the defendant has been advised of his right to remain silent and his right to counsel. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id*. A suspect is "in custody for *Miranda* purposes when placed under formal arrest or when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest." *United States v. Bengivenga*, 845 F.2d 593, 596 (5th Cir. 1988) (en banc) (internal quotation marks omitted); *United States v. Cavazos*, 668 F.3d 190, 193 (5th Cir. 2012).

"Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave." *Cavazos*, 668 F.3d at 193 (quoting *J.D.B. v. N. Carolina*, 131 S. Ct. 2394, 2402 (2011)). The custody determination

"depends on the totality of circumstances." *Cavazos*, 668 F.3d at 193 (quotation omitted).   Important factors include, but are not limited to: (1) the length of the questioning; (2) the location of the questioning; (3) the accusatory, or non-accusatory, nature of the questioning; (4) the amount of restraint on the individual's physical movement; and (5) statements made by officers regarding the individual's freedom to move or leave.  *United States v. Wright*, 777 F.3d 769, 775 (5th Cir. 2015) (citations omitted).   However, "no single circumstance is determinative, and we make no categorical determinations."  *Cavazos*, 668 F.3d at 195.

I would find that the totality of the circumstances surrounding Ortiz's interrogation inside the agent's car rose to a level of custody equivalent to formal arrest, sufficient that a reasonable person would not have felt free to terminate the questioning and leave.

Several factors lead me to this conclusion.   First, the agents followed Ortiz to the gas station based on a specific suspicion of a straw purchase, and immediately singled him out for additional questioning.  *See Cavazos*, 668 F.3d at 194-95 (finding it significant that the defendant "was immediately located and handcuffed at the start of the search, demonstrating that the agents sought out Cavazos and had physical dominion over him").   "The awareness of the person being questioned by an officer that he has become the 'focal point' of the investigation . . . may well lead him to conclude, as a reasonable person, that he is not free to leave, and that he has been significantly deprived of his freedom."  *Bengivenga*, 845 F.2d at 597 n. 16 (emphases omitted).   Here, Ortiz was almost immediately told he was being questioned by an agent who specialized in investigating straw purchases.   As more officers arrived on the scene, Ortiz was instructed to get in the back seat of an agent's car with two agents who asked him, according to Agent Milligan's testimony, "more in depth questions" regarding the guns he had just purchased.   At the end of the

questioning, Milligan wrote a detailed statement regarding the purchase and Ortiz's admissions and had Ortiz sign it.    Regardless of whether the questioning was particularly "accusatory" in tone, it was specific, detailed and in reference to a particular offense for which the agents had clearly singled out Ortiz as a suspect. And, of course, Ortiz's co-conspirator, Diaz-Mesa, was given *Miranda* warnings while Ortiz was not, although the two had acted in concert during the purchase and were in virtually identical circumstances during the stop. By contrast, in *Wright,* we found that Wright was not subject to custodial interrogation and found it significant that the agents were searching a house where Wright was one of several occupants removed during a search, and Wright was not immediately singled out. *Wright*, 777 F.3d at 776.

Although the stop was conducted at a gas station, the stop was neither spontaneous nor brief; the detailed questioning occurred once the agents had placed Ortiz in the backseat of one of their cars; and seven agents were on the scene in six separate cars. This scene bore little resemblance to an ordinary traffic stop. It was a much more coercive and "police-dominated" situation. *See Berkemer v. McCarty*, 468 U.S. 420, 437-39 (1984) (finding that brevity, spontaneity, and public nature of ordinary traffic stop, and small number of officers involved, generally rendered atmosphere insufficiently "police dominated" to be coercive). While two officers actually questioned Ortiz inside the car, we have explicitly noted that during an interrogation, "the presence of other officers at the location is also relevant to the Court's inquiry." *Cavazos*, 668 F.3d at 194 n.3 (citing *United States v. Fike*, 82 F.3d 1315, 1325 (5th Cir. 1996)). In fact, Ortiz was approached by at least four agents who asserted their control over him before he was interrogated in the car: Milligan and Phan, who approached him with guns drawn and removed him from the car at the beginning of the stop; Smith, who ordered Ortiz cuffed and frisked; and

Balesteros, who, along with Milligan, instructed Ortiz to get inside the police car and conducted the questioning.

The length of the detention also differentiated this situation from an ordinary non-custodial stop.  By the time Ortiz exited Balesteros's car, he had been detained for up to sixty minutes, and the questioning in the car alone lasted between twenty and forty minutes.  *See United States v. Chavira,* 614 F.3d 127, 134 (5th Cir. 2010) (finding custodial interrogation where suspect was questioned for thirty to forty minutes at secondary immigration inspection); *Cavazos*, 668 F.3d at 194 & n.1 (citing United *States v. Harrell*, 894 F.2d 120, 124 n.1 (5th Cir. 1990) (noting that "a detention of approximately an hour raises considerable suspicion" that a defendant is in custody)).  By contrast, an ordinary traffic stop is non-custodial because it is "presumptively temporary and brief," thus setting it apart from "stationhouse interrogation, which frequently is prolonged, and in which the detainee often is aware that questioning will continue until he provides his interrogators the answers they seek." *Berkemer*, 468 U.S. at 437-38.  While forty minutes is not necessarily "prolonged," in the circumstances of Ortiz's situation, the questioning in the back of the agent's car was more akin to stationhouse interrogation than to those brief questions that are typically incident to a traffic stop.

Further, Ortiz had been handcuffed for about ten minutes prior to the interrogation in the car, which is a factor that we have previously found to be relevant.  *Cavazos*, 668 F.3d at 194-95.  As *Cavazos* noted, "While the handcuffs were removed prior to interrogation, the experience of being singled out and handcuffed would color a reasonable person's perception of the situation and create a reasonable fear that the handcuffs could be reapplied at any time." *Id.* at 195.

The agents also confiscated Ortiz's keys at some point, significantly restraining his freedom to leave the situation, and did not return them until

after the guns were seized. *See Chavira*, 614 F.3d at 134 (finding it significant that Chavira's birth certificate and identification were confiscated at immigration inspection). The majority assumes that Ortiz had his own keys during the questioning, due to Agent Milligan's failure to remember when the keys were initially confiscated. The district court made no specific finding regarding the keys. But the record is clear that Milligan used the keys to open the hatch of Ortiz's Blazer to seize the rifles after his interrogation of Ortiz in the car, and that Milligan obtained the keys from another agent in order to do so, not from Ortiz. I am not convinced that, even assuming Ortiz did have his keys, this fact would have led a reasonable person to perceive himself as free to jump out of the agent's car during the ongoing questioning and into his own to terminate the interrogation. The lack of clarity regarding possession of the keys does not undermine the other factors surrounding the coercive situation faced by Ortiz.

While Ortiz was told he was not under arrest, such statements are not a "talismanic factor." *Cavazos* 668 F.3d at 195. Instead, we must analyze these statements "for their effect on a reasonable person's perception" and weigh them "against opposing facts." *Id.* Here, Ortiz was told initially that he was not under arrest. But the agents' subsequent actions—including the arrival of multiple additional agents, the handcuffing, and the agents placing Ortiz inside the police car to ask him in depth questions about a specific suspected offense—would indicate otherwise to a reasonable person. Further, to a reasonable lay person, a statement that he is not "under arrest" is not "the equivalent of an assurance that he could terminate the interrogation and leave." *Cavazos*, 668 F.3d at 195 (finding that telling the defendant that an interview is "non-custodial" is not the equivalent of telling him "he could terminate the interrogation and leave"); *see United States v. Colonna*, 511 F.3d 431, 436 (4th Cir. 2007) (defendant was informed he was "not under arrest"

24

but "was never told he was free to leave or that he did not have to respond to questions"); *cf. United States v. Perrin*, 659 F.3d 718, 721 (8th Cir. 2011) (defendant was informed he "did not have to answer questions"); *United States v. Hargrove*, 625 F.3d 170, 179 (4th Cir. 2010) (defendant was informed "he was not under arrest *and* that he was free to leave"). By contrast, in *Wright,* the officers specifically told the defendant "several times" that he was "free to leave" before questioning him, which was a "crucial" factor in the outcome of that case. *Wright*, 777 F.3d at 776. Here, the agents never told Ortiz that he was free to leave or that he did not have to answer questions.

While no single factor is determinative, the totality of the circumstances surrounding Ortiz's statements in the agent's car indicate a level of restraint on par with arrest and would indicate to a reasonable person that he was not free to terminate the interrogation and leave. *See Cavazos*, 668 F.3d at 193-95. I therefore dissent from the majority's holding that Ortiz's second oral statement and written statement should not be suppressed. I concur in all other respects.