# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 17-11490

United States Court of Appeals
Fifth Circuit

**FILED**
June 17, 2019

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

> Plaintiff - Appellee

v.

IGNACIO ARELLANO-BANUELOS,

> Defendant - Appellant

---

Appeal from the United States District Court
for the Northern District of Texas

---

Before ELROD, HIGGINSON, and ENGELHARDT, Circuit Judges.

STEPHEN A. HIGGINSON, Circuit Judge:

Ignacio Arellano-Banuelos was convicted by a jury of illegal reentry. On appeal, he argues that his confession was admitted in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966), he was denied the opportunity to present a statute of limitations defense, the district court erred in striking a prospective juror for cause, and the admission of a certificate of non-existence of record violated his rights under the Confrontation Clause.

In an earlier opinion, we remanded this case to the district court for additional findings as to whether Arellano-Banuelos was "in custody" for purposes of *Miranda. See United States v. Arellano-Banuelos*, 912 F.3d 862 (5th Cir. 2019). Our prior opinion recounts the pertinent factual background.

No. 17-11490

*See id.* at 864–65. After considering the district court's findings and the parties' supplemental briefs, we now affirm.

## I.

### A.

Under *Miranda*, an individual subjected to "in-custody interrogation" must first "be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." 384 U.S. at 444–45. These safeguards are required "[b]ecause custodial police interrogation, by its very nature, isolates and pressures the individual," and "heightens the risk that an individual will not be accorded his privilege under the Fifth Amendment not to be compelled to incriminate himself." *Dickerson v. United States*, 530 U.S. 428, 435 (2000) (cleaned up).

Arellano-Banuelos's *Miranda* claim arises out of an August 2015 interview with Norberto Cruz, a U.S. Immigration and Customs Enforcement (ICE) agent. At the time of the interview, Arellano-Banuelos was serving a sentence of 15 months' imprisonment on unrelated state offenses. Cruz and two other ICE agents traveled to the state prison to interview 23 inmates, including Arellano-Banuelos. The inmates were escorted to the office in groups of five. A prison guard stood at the door of the office, which remained open. Cruz and another ICE agent conducted simultaneous interviews at separate tables, and a third agent photographed and fingerprinted the inmates after the conclusion of their interviews. These interviews ordinarily lasted between ten and thirty minutes, although the parties agree that Arellano-Banuelos's interview took about ten to fifteen minutes.

Cruz interviewed Arellano-Banuelos about his immigration status and past deportation without providing complete *Miranda* warnings. Over the course of this interview, Arellano-Banuelos acknowledged his alienage, his

No. 17-11490

prior removal, and his lack of permission from the Attorney General to reenter the United States. Arellano-Banuelos was later charged with illegal reentry, and he moved to suppress his admissions to Cruz. The district court denied the motion after finding that the August 2015 interview "was not a custodial interrogation for *Miranda* purposes."

In a prior opinion, we held that this interview was an "interrogation" under *Miranda* because Cruz should have known that his questioning was "reasonably likely to elicit an incriminating response from the suspect." *Arellano-Banuelos*, 912 F.3d at 866 (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)). We remanded to the district court for additional findings on the issue of Arellano-Banuelos's custodial status. *Id.* at 869. After hearing further testimony and argument, the district court concluded that Arellano-Banuelos was not in custody under *Miranda* during the August 2015 interview.

We review the district court's "factual findings for clear error and the ultimate constitutionality of law enforcement action de novo." *United States v. Robinson*, 741 F.3d 588, 594 (5th Cir. 2014). "The clearly erroneous standard is particularly deferential where denial of the suppression motion is based on live oral testimony because the judge had the opportunity to observe the demeanor of the witnesses." *United States v. Ortiz*, 781 F.3d 221, 226 (5th Cir. 2015) (cleaned up). Further, we consider "the evidence in the light most favorable to the prevailing party, which in this case is the government." *United States v. Wright*, 777 F.3d 769, 773 (5th Cir. 2015) (quoting *United States v. Santiago*, 410 F.3d 193, 197 (5th Cir. 2005)).

B.

Custody for purposes of *Miranda* "is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *Howes v. Fields*, 565 U.S. 499, 508–09 (2012). This inquiry "is an objective one—the subjective intent of the questioners and the subjective fear

of the questioned person are irrelevant." *United States v. Melancon*, 662 F.3d 708, 711 (5th Cir. 2011). We first consider whether "'there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *Maryland v. Shatzer*, 559 U.S. 98, 112 (2010) (quoting *New York v. Quarles*, 467 U.S. 649, 655 (1984)). The Supreme Court has observed that "[t]his test, no doubt, is satisfied by all forms of incarceration." *Id.* Yet, "the freedom-of-movement test identifies only a necessary and not a sufficient condition for *Miranda* custody." *Id.* Courts also consider "the additional question [of] whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda.*" *Fields*, 565 U.S. at 509.

Although Arellano-Banuelos was incarcerated at the time of the August 2015 interview, the Supreme Court has instructed that "imprisonment alone is not enough to create a custodial situation within the meaning of *Miranda.*" *Id.* at 511. The Supreme Court drew this conclusion in part because of the differences in circumstances between a prisoner serving a lawful sentence and a suspect who "is arrested in his home or on the street and whisked to a police station for questioning." *Id.* "[T]he ordinary restrictions of prison life, while no doubt unpleasant, are expected and familiar and thus do not involve the same 'inherently compelling pressures' that are often present when a suspect is yanked from familiar surroundings in the outside world and subjected to interrogation in a police station." *Id.* (quoting *Shatzer*, 559 U.S. at 103). Moreover, "[s]entenced prisoners, in contrast to the *Miranda* paradigm, are not isolated with their accusers," and their imprisonment "is relatively disconnected from their prior unwillingness to cooperate in an investigation." *Shatzer*, 559 U.S. at 113.

Of course, prisoners sometimes *are* in custody for *Miranda* purposes. "An inmate who is removed from the general prison population for questioning and

is thereafter subjected to treatment in connection with the interrogation that renders him 'in custody' for practical purposes will be entitled to the full panoply of protections prescribed by *Miranda*." *Fields*, 565 U.S. at 514 (cleaned up); *see also Melancon*, 662 F.3d at 711 (explaining that a "prison inmate is not automatically always 'in custody' within the meaning of *Miranda*, although the prison setting may increase the likelihood that an inmate is in 'custody' for *Miranda* purposes") (cleaned up). The custody determination must "focus on all of the features of the interrogation," including "the language that is used in summoning the prisoner to the interview and the manner in which the interrogation is conducted." *Fields*, 565 U.S. at 514.

In *Fields*, the Supreme Court held that a prisoner was not in custody under *Miranda* when he was interviewed by two sheriff's deputies regarding allegations of sexual abuse of a child. *Id.* at 502–03, 514. The Court acknowledged several factors that could support a finding of custody, including that Fields "was not advised that he was free to decline to speak with the deputies," the "interview lasted for between five and seven hours," the deputies were armed, and one of the deputies "used a very sharp tone" and once used profanity. *Id.* at 515. Other offsetting circumstances, however, led the Court to determine that Fields was not in custody. *Id.* "Most important, [Fields] was told at the outset of the interrogation, and was reminded again thereafter, that he could leave and go back to his cell whenever he wanted." *Id.* Additionally, Fields "was not physically restrained or threatened," he "was interviewed in a well-lit, average-sized conference room," "the door to the conference room was sometimes left open," and he "was offered food and water." *Id.* The Court concluded that "these objective facts are consistent with an interrogation environment in which a reasonable person would have felt free to terminate the interview and leave." *Id.* (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664–65 (2004)).

5

No. 17-11490

C.

In critical respects, Arellano-Banuelos's August 2015 ICE interview had fewer hallmarks of *Miranda* custody than the interview at issue in *Fields*.[1] The interview was much shorter—lasting ten to fifteen minutes rather than five to seven hours. *See id.* at 515. Multiple people were present in the interview room, including another prisoner, and Arellano-Banuelos was not isolated with Cruz. *Cf. Miranda*, 384 U.S. at 476 (emphasizing the "compelling influence" of "lengthy interrogation or incommunicado incarceration"). The ICE agents were not armed, and the prison guard did not have a firearm. *Cf. Fields*, 565 U.S. at 515. Although Cruz stated that he knew Arellano-Banuelos had been previously removed, he did not raise his voice during the interview, use a sharp tone of voice, or use profanity. *Cf. id.* at 503, 515.

Other circumstances are similar to the facts presented in *Fields*. Arellano-Banuelos was not restrained during the interview, but he was escorted to the interview by a prison guard and required to pass through locked doors. *See id.* at 502–03; *see also id.* at 513 (noting that a prisoner may be "taken, under close guard, to the room where the interview is to be held" but "such procedures are an ordinary and familiar attribute of life behind bars"). Arellano-Banuelos was not told in advance that he could decline the interview, and the district court found that a reasonable person in his position would have believed he was required to attend the interview. *See id.* at 515 (noting that Fields "did not invite the interview or consent to it in advance, and he was not advised that he was free to decline to speak with the deputies").

Arellano-Banuelos points to several factors that he asserts distinguishes his situation from the interrogation at issue in *Fields*. First, and most

---

[1]    We base our analysis on the district court's factual findings as to what occurred during the interview. Neither party argues that those findings are clearly erroneous, and we perceive no clear error.

significantly, he emphasizes that he was never explicitly told he was free to leave the interview room. In *Fields*, by contrast, the Supreme Court underscored that the "[m]ost important" factor in its custody determination was that the prisoner "was told that he was free to end the questioning and to return to his cell." *Id.* at 515–17. This type of straightforward advisement would certainly have strengthened the government's case. *See Wright*, 777 F.3d at 776 (holding that a suspect was not in custody under *Miranda* in part because of the "crucial" fact that he was repeatedly told "that he was 'free to leave' and that he 'wasn't under arrest'"); *see also Ortiz*, 781 F.3d at 231 (explaining that statements that a suspect "was not under arrest . . . would suggest to a reasonable person that he was free to leave, but they are less clear than the statements in *Wright*, which answered the question directly"). Yet the absence of an explicit statement that an interviewee is free to leave does not compel a finding of *Miranda* custody. Other statements and circumstances may similarly suggest to a reasonable person that he can choose to end the questioning and leave. *See Ortiz*, 781 F.3d at 231–33.

Here, Cruz told Arellano-Banuelos that his statement had to be voluntary and that the interview would terminate if he chose not to speak with Cruz. Cruz also reviewed a form with Arellano-Banuelos advising him that his "statement must be freely and voluntarily given" and that any statement "may be used against [him] in any administrative or criminal proceeding."[2] Arellano-Banuelos contends that such warnings are inadequate because *Miranda*'s protections apply even absent proof that a statement was in fact involuntary.

---

[2] Although Arellano-Banuelos presented a different account of Cruz's statements at the suppression hearing, he does not dispute on appeal the district court's findings as to what was said during the interview. We note that the district court made no adverse credibility determinations, and we therefore do not rely on the government's suggestion that we should disbelieve Arellano-Banuelos's testimony because he has in the past received disciplinary infractions.

No. 17-11490

We agree that telling an interviewee that his statement must be voluntary is insufficient, alone, to satisfy the concerns underlying *Miranda*. *See, e.g., Dickerson*, 530 U.S. at 442 (holding that a multi-factor test focused on "determining the voluntariness of a suspect's confession" is not an "adequate substitute for the warnings required by *Miranda*"). Such advisories are nonetheless relevant factors in assessing the interview environment.

Moreover, Cruz did more than advise Arellano-Banuelos that his statement must be voluntary and that any statements he made could be used against him. Cruz testified that he tells inmates that they do not have to speak with him and that, if they do not want to talk to him, the interview will end. The district court found that Cruz explained this to Arellano-Banuelos. Given the circumstances of the August 2015 ICE visit, with multiple inmates being interviewed and processed on a tight time frame, the clear implication of ending the interview is that Arellano-Banuelos could then leave and return to his ordinary life in the prison.[3] A reasonable inmate would not expect to be required to stay in the office after the termination of the interview. Indeed, two other inmates did refuse to answer Cruz's questions on the day of Arellano-Banuelos's interview, and their interviews terminated. In this context, we believe that the objective circumstances of the interview were "consistent with an interrogation environment in which a reasonable person would have felt free to terminate the interview and leave." *Fields*, 565 U.S. at 515 (quotation omitted).

Arellano-Banuelos highlights other aspects of the interview that he contends created an unacceptable risk of coercion. He notes that he was placed in a holding cell prior to the interview, he was required to stand in the hallway

---

[3]    We emphasize that officer statements must be interpreted in context. In a different interrogation environment, the statement that someone is free to terminate an interview may not signify that he is free to leave.

before the interview without leaning on anything, and he was not given a chance to use the restroom. Arellano-Banuelos also emphasizes, and the district court found, that the administrative building where the interviews were held experienced electrical problems that caused the lights to flicker and interfered with the air conditioning system. Cruz testified that the office was very hot and he wanted to get through the interviews as quickly as possible. These facts indicate that the interview process was uncomfortable, and provide some support for Arellano-Banuelos's custody argument. *Cf. id.* at 515 (noting that Fields "was 'not uncomfortable'" in the interview room). Critically, however, these conditions were not tied to Arellano-Banuelos's cooperation with Cruz. As discussed above, a reasonable inmate in Arellano-Banuelos's position would have believed he could terminate the interview and leave the office. This exit option substantially reduces the coercive pressures of an unpleasant interview environment.

Finally, Arellano-Banuelos contends that his situation is different from that of Fields because Cruz had "the authority to affect the duration of his sentence." *See id.* at 512. Specifically, Arellano-Banuelos was told that if he cooperated, this would reduce the amount of time he might spend in ICE detention before his removal from the United States. This offer may have given Arellano-Banuelos some "reason to think that the listeners ha[d] official power over him." *Id.* at 512 (quoting *Illinois v. Perkins*, 496 U.S. 292, 297 (1990)). There is no suggestion in the record, however, that Cruz had any authority to influence the length of Arellano-Banuelos's state prison sentence. Unlike a suspect who "may be pressured to speak by the hope that, after doing so, he will be allowed to leave and go home," the only benefit that Cruz could offer was a speedier deportation once Arellano-Banuelos completed his state sentence. *Id.* at 511. In light of other factors pointing to an absence of custody,

No. 17-11490

such an offer does not create the "inherently coercive" interview environment contemplated by *Miranda. Id.* at 509.

Considering all the circumstances of the August 2015 interview, and viewing the evidence in the light most favorable to the government, we hold that Arellano-Banuelos was not in custody for purposes of *Miranda.* We therefore affirm the district court's denial of the motion to suppress.

II.

Arellano-Banuelos next contends that the district court erroneously prevented him from presenting a statute of limitations defense to the jury. The statute of limitations for illegal reentry is five years. 18 U.S.C. § 3282(a). The limitations period "begins to run at the time the alien is 'found,' barring circumstances that suggest that the INS should have known of his presence earlier." *United States v. Santana-Castellano*, 74 F.3d 593, 597 (5th Cir. 1996). Arellano-Banuelos was indicted in May 2016. Thus, the relevant question is whether Arellano-Banuelos was "found" in the United States before May 2011.

For an alien to be "found" in the United States, the "alien's physical presence must be discovered and noted *by immigration authorities* and the illegality of the alien's presence must be reasonably attributable *to immigration authorities* through the exercise of typical law enforcement diligence." *United States v. Compian-Torres*, 712 F.3d 203, 207 (5th Cir. 2013); *see also Santana-Castellano*, 74 F.3d at 597 (explaining that immigration authorities should know of an alien's presence if, for example, "he reentered the United States through an official border checkpoint in the good faith belief that his entry was legal"). Arellano-Banuelos sought to present a statute of limitations defense through evidence that he filed income tax returns and that he put his name on his son's birth certificate.

10

No. 17-11490

The district court's decision to admit or exclude evidence is reviewed for abuse of discretion.[4] *See United States v. Walker*, 410 F.3d 754, 757 (5th Cir. 2005). Here, the district court properly excluded Arellano-Banuelos's proposed evidence as legally irrelevant. We held in *Compian-Torres* that knowledge of an alien's presence by other government officials, including state or federal authorities, is not imputed to immigration authorities. *See* 712 F.3d at 207–08. Arellano-Banuelos attempts to distinguish *Compian-Torres* as a case about the sufficiency of the evidence rather than the exclusion of evidence. But the court in *Compian-Torres* characterized the issue presented as "a pure question of law," and proceeded to resolve the legal question of what it means for an immigrant to be "found" in the United States. *Id.* at 207. Under this caselaw, the district court correctly concluded that Arellano-Banuelos's tax returns and his son's birth certificate are not probative of when he was found in the United States by immigration authorities.

For the same reasons, the district court did not abuse its discretion in refusing to instruct the jury on a statute of limitations defense. *See United States v. Dailey*, 868 F.3d 322, 327 (5th Cir. 2017) (noting the district court's "substantial latitude in formulating jury instructions"). There was no evidence in the trial record that immigration authorities had actual or constructive knowledge of Arellano-Banuelos's presence in the United States before May 2011. *See United States v. Branch*, 91 F.3d 699, 712 (5th Cir. 1996) (explaining that the district court may "refuse to give a requested instructor that lacks sufficient foundation in the evidence"). We perceive no error in the district court's rulings on the statute of limitations.

---

[4]     The government asserts that Arellano-Banuelos may have forfeited his challenge to the district court's exclusion of evidence because he did not attempt to introduce the evidence at trial. Because we find no error in the district court's ruling under any standard of review, we need not address the forfeiture issue.

No. 17-11490

III.

Arellano-Banuelos's challenge to jury selection is similarly unavailing. The district court struck a prospective juror for cause after the juror stated that he would have difficulty being fair and impartial because he believed that the immigration laws were too harsh. "We review the district court's ruling as to juror impartiality only for manifest abuse of discretion." *United States v. Munoz*, 15 F.3d 395, 397 (5th Cir. 1994). Moreover, "[i]n noncapital cases, removal of a venire member generally is not grounds for reversal unless 'the jurors who actually sat were not impartial within the meaning of the Sixth Amendment.'" *United States v. Parker*, 133 F.3d 322, 327 (5th Cir. 1998) (quoting *United States v. Gonzalez-Balderas*, 11 F.3d 1218, 1222 (5th Cir. 1994)). Arellano-Banuelos has not shown that the district court manifestly abused its discretion in striking the prospective juror, nor has he offered any basis to question the impartiality of the jury empaneled in his case.

IV.

For the first time on appeal, Arellano-Banuelos argues that the admission of a certificate of non-existence of record (CNR) violated his rights under the Confrontation Clause. The CNR certified that there is no record that Arellano-Banuelos received permission to return to the United States following his prior deportation. Because Arellano-Banuelos did not object to the admission of the CNR, our review is for plain error. *See United States v. Martinez-Rios*, 595 F.3d 581, 584 (5th Cir. 2010). We will find plain error only if, among other factors, the district court made a "clear or obvious" error. *Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1904 (2018).

The Confrontation Clause of the Sixth Amendment guarantees a criminal defendant the right to cross-examine witnesses who provide testimonial statements, unless the declarant is unavailable and the defendant had a prior opportunity for cross-examination. *See Crawford v. Washington*,

12

541 U.S. 36, 68 (2004). We have held that a CNR qualifies as a testimonial statement. *See Martinez-Rios*, 595 F.3d at 586. Arellano-Banuelos therefore had the right "to be confronted with the analyst who made the certification." *Bullcoming v. New Mexico*, 564 U.S. 647, 652 (2011); *see also Martinez-Rios*, 595 F.3d at 586 (finding constitutional error because the person who "prepared the CNR" did not testify at trial).

Priscilla Dobbins, an officer with U.S. Citizenship and Immigration Services (USCIS), authored and signed the CNR in this case. She certified that she had the authority "to ascertain whether there are particular documents in" an alien's file. She further attested that USCIS systems were searched to ensure that no application for permission to reenter the United States after removal existed in Arellano-Banuelos's file. Dobbins testified at trial and Arellano-Banuelos had the chance to cross-examine her, but he chose not to do so. Arellano-Banuelos argues that the admission of the CNR nonetheless violated his rights under the Confrontation Clause because Dobbins did not personally check all the systems that led to the certification. Instead, a staff member ran the initial checks and created printouts.

Arellano-Banuelos does not offer legal authority for the proposition that every individual involved in the preparation of a document such as a CNR must testify at trial. *Cf. Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 311 n.1 (2009) (explaining that "it is not the case, that anyone whose testimony may be relevant in establishing the chain of custody, authenticity of the sample, or accuracy of the testing device, must appear in person as part of the prosecution's case"). Because Arellano-Banuelos had an opportunity to cross-examine the individual who prepared and signed the CNR, he cannot show a "clear or obvious" Confrontation Clause error.

## V.

The judgment of the district court is AFFIRMED.