# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
July 18, 2022

Lyle W. Cayce
Clerk

No. 20-10999

UNITED STATES OF AMERICA,

*Plaintiff—Appellant*,

*versus*

BRAYLON RAY COULTER,

*Defendant—Appellee*.

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:19-CR-68-1

Before RICHMAN, *Chief Judge*, and JONES and WILSON, *Circuit Judges*.
EDITH H. JONES, *Circuit Judge*:

A lone police officer performed a traffic stop on Appellee Braylon Ray Coulter in the middle of the night. Having been given reason to suspect that Coulter, who revealed an aggravated robbery conviction, had a gun, the officer handcuffed him and asked where it was. Coulter answered, and the officer's partner arrived later to find a .40 caliber pistol and .37 ounces of marijuana in Coulter's backpack between the front seats of the van he drove. Before Coulter divulged that information, the officer did not provide *Miranda* warnings. *See Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966). The admissibility of Coulter's unwarned statements therefore depends on

No. 20-10999

whether he was "in custody" as contemplated by *Miranda* at the time he offered them.

We hold that a reasonable person in Coulter's position would not have thought that he was in custody for *Miranda* purposes. Moreover, the officer questioned Coulter in an environment that was not tantamount to a station house interrogation as contemplated by *Miranda*. All of Coulter's unwarned statements are therefore admissible. The district court's judgment suppressing those statements is REVERSED.

## I. BACKGROUND

Coulter was driving an old van with "squeaky brakes" through a neighborhood at 2:41 a.m. on July 15, 2018. Officer Nino de Guzman of the Lancaster, Texas Police Department began following Coulter and discovered that the van "was registered to an address in a different city, that its registration was expired, and that it had no insurance." Officer Guzman thought Coulter might have been a burglar and decided to pull him over.[1]

After Coulter voluntarily stepped out of the van, Officer Guzman twice asked him whether he had any guns. Coulter said "[m]m-mm" before answering no.[2] Officer Guzman then frisked Coulter before asking him who owned the van and where he came from. Coulter replied that it belonged to his boss and that he just left work. When Officer Guzman also asked Coulter for identification, he admitted to not having any. Officer Guzman then conducted a background check and learned that Coulter's driver's license

---

[1] Officer Guzman testified that the expired registration alone gave him probable cause to pull Coulter over.

[2] Coulter did, however, admit to having some kind of knife on his person.

was suspended.[3] Coulter also disclosed that he was on parole for aggravated robbery. Following that admission, Officer Guzman asked Coulter for a third time whether he had a gun. Coulter once again insisted that he did not and then added that he did not own the van. Officer Guzman inquired more broadly as to whether "anything illegal" was in the van, even as he emphasized that he did not care if Coulter had a small amount of marijuana. Without admitting to possession, Coulter conceded that he smoked marijuana in the van the week before and that morning. This admission, combined with Coulter's "suspicious behavior," gave Officer Guzman probable cause to conduct a search.

After Officer Guzman smelled marijuana emitting from the van, the court found that Coulter told Officer Guzman he "want[ed] to be real with [him]" before volunteering that he "did not need any more 'strikes' and indicated . . . that he had a gun in the van." Specifically, after Officer Guzman asked for a fourth time whether he had a gun, Coulter suggested that he would be "losing[]" by answering and that he did not "want to lose[.]" Coulter also insisted that he "had people trying to kill [him] . . . . [and did not] want to be caught out [there] with nothing." These comments prompted Officer Guzman to inform Coulter that he was "just going to detain [him]" so that he did not "run up and grab the gun." Coulter offered to walk farther away instead, though he never moved.

Officer Guzman then instructed Coulter to turn and face his police car and handcuffed him "for officer safety." As he did so, Officer Guzman reiterated that Coulter was "[j]ust detained. That's it." He also asked Coulter whether he understood what detention meant, but Coulter did not

---

[3] After first referring to Coulter's license as expired, the district court later refers to it as suspended before referring to it as expired once more. But Officer Guzman testified that it was suspended.

directly respond.   Officer Guzman explained that the handcuffs were necessary because he did not want to "wind up fighting with [Coulter]." Coulter said "[n]o, no, no, no[]" before saying that Officer Guzman was "cool."  Officer Guzman then emphasized for a third time that Coulter was "just detained" and asked again whether he understood what that meant. Coulter responded "[y]eah."[4]  Officer Guzman instructed Coulter "not to pull away, because [he] did not 'want to tase [sic] [him] and do a bunch of paperwork.'"  Coulter said that was "fine."  Coulter then reiterated that he "want[ed] to be real with [Officer Guzman]."

After securing Coulter in handcuffs, Officer Guzman asked him where the suspected gun was.  Coulter then explicitly admitted for the first time that he had a gun in his backpack.  Coulter later suggested that Officer Guzman could just take the gun and let him go.  While Coulter remained handcuffed and standing in the street, a fellow officer arrived, searched the van, and located the gun along with .37 ounces (approximately 10 grams) of marijuana in his backpack.[5]  Officer Guzman then arrested Coulter.

A grand jury indicted Coulter in February 2019 for being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1).  About one year later, he moved to "suppress all evidence and observations arising from the vehicle search."  The district court held a hearing before denying that motion in June 2020.  In doing so, the district court reasoned that Officer Guzman had reasonable suspicion to stop Coulter, reasonable suspicion of further

---

[4] Another transcript indicates that Coulter responded by saying "[o]kay."

[5] The government contends that *both* officers recovered the gun and drugs.  The district court stated that "Officer Guzman . . . searched the van and found the firearm." But Officer Guzman testified that his partner conducted the search.

criminal activity to continue the stop, and probable cause to ultimately search the van based on Coulter's behavior and admitted recent drug use.

After the district court denied Coulter's motion, a grand jury charged him in a second, superseding indictment for being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1) and § 924(a)(2), and engaging in a conspiracy to obstruct an official proceeding, in violation of 18 U.S.C. § 1512(k) and (c)(2).  The government added the conspiracy charge because Coulter allegedly influenced his boss to "fabricate a bill of sale for the gun found in the van and to falsely claim that [his boss] had left that firearm in [the van]."

Coulter then moved to "suppress all statements [he made] in response to the officer's questioning once he was in handcuffs."  Coulter contended for the first time that he was in custody once handcuffed and that Officer Guzman did not deliver the requisite *Miranda* warnings.  The government responded that Coulter was not in custody just because he was handcuffed, and *Miranda* warnings were therefore unnecessary.

The district court granted the suppression motion in October 2020 without holding another hearing.  Reviewing the previous record, the court determined that "the amount of restraint on [Coulter's] physical movement, as well as Officer Guzman's statements regarding [Coulter's] freedom to move or leave, weigh[ed] in favor of finding that [Coulter] was in custody."  Under these circumstances, and in the absence of the officer's stating Coulter's *Miranda* rights, the district court excluded "[a]ny statement made by [Coulter] after he was placed in handcuffs and before he was given *Miranda* warnings."

The government filed this interlocutory appeal from the district court's judgment and the trial has been continued pending resolution of the appeal.  The government argues that the district court erred because a

No. 20-10999

reasonable person in Coulter's position would not have thought that the restraint on his freedom was functionally equivalent to a formal arrest and that the environment in which he was questioned did not necessitate *Miranda* warnings.

## II. STANDARD OF REVIEW

"Custody determinations under *Miranda* present 'a mixed question of law and fact.'" *United States v. Arellano-Banuelos*, 912 F.3d 862, 868 (5th Cir. 2019) (quoting *Thompson v. Keohane*, 516 U.S. 99, 102, 116 S. Ct. 457, 460 (1995)). "When considering the denial of a motion to suppress, this Court reviews factual findings for clear error and legal conclusions, including . . . whether *Miranda*'s guarantees have been impermissibly denied, de novo." *United States v. Nelson*, 990 F.3d 947, 952 (5th Cir. 2021) (citations omitted). In undertaking such a review, this court evaluates "'evidence in the light most favorable to the party that prevailed in the district court,' . . . and [it] will uphold the district court's ruling on the motion 'if there is any reasonable view of the evidence to support it[.]'" *United States v. Michalik*, 5 F.4th 583, 588 (5th Cir. 2021) (quoting *United States v. Chavez*, 281 F.3d 479, 483 (5th Cir. 2002) and *United States v. Michelletti*, 13 F.3d 838, 841 (5th Cir. 1994) (en banc)).

## III. DISCUSSION

The Fifth Amendment, incorporated against the states, provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . ." "To safeguard the uncounseled individual's Fifth Amendment privilege against self-incrimination, the *Miranda* Court held, suspects interrogated while in police custody must be told that they have a right to remain silent, that anything they say may be used against them in court, and that they are entitled to the presence of an attorney, either retained or appointed, at the interrogation." *Thompson*, 516 U.S. at 107, 116 S. Ct. at

6

No. 20-10999

462 (citing *Miranda*, 384 U.S. at 444, 86 S. Ct at 1612). In other words, "the *Miranda* rule is a prophylactic employed to protect against violations of the Self-Incrimination Clause."[6] *United States v. Patane*, 542 U.S. 630, 636 124 S. Ct. 2620, 2626 (2004) (plurality opinion); *see also Howes v. Fields*, 565 U.S. 499, 507, 132 S. Ct. 1181, 1188 (2012) (quoting *Maryland v. Shatzer*, 559 U.S. 98, 103, 130 S. Ct. 1213, 1217 (2010)). "[I]f the police take a suspect into custody and then ask him questions without informing him of the rights enumerated above, his responses cannot be introduced into evidence to establish his guilt." *Berkemer v. McCarty*, 468 U.S. 420, 429, 104 S. Ct. 3138, 3144 (1984) (citations omitted). Officers do not, however, "violate a suspect's constitutional rights (or the *Miranda* rule) by negligent or even deliberate failures to provide the suspect with the full panoply of warnings prescribed by *Miranda*."[7] *Patane*, 542 U.S. at 641, 124 S. Ct. at 2629; *see also Vega*, 2022 WL 2251304 at *4. Any such violations "occur, if at all, only upon the admission of unwarned statements into evidence at trial." *Patane*, 542 U.S. at 641, 124 S. Ct. at 2629.

Custodial interrogations that necessitate *Miranda* warnings consist of "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any

---

[6] The Supreme Court recently clarified that while the "set of prophylactic rules[]" imposed by *Miranda* is 'constitutionally based, . . . they are prophylactic rules nonetheless." *Vega v. Tekoh*, 597 U.S. __, __ S. Ct. __, 2022 WL 2251304, *4 (June 23, 2022) (quoting *Dickerson v. United States*, 530 U.S. 428, 440, 120 S. Ct. 2326, 2334 (2000)). And it plainly stated that its prior decisions have "avoid[ed] saying that a Miranda violation is the same as a violation of the Fifth Amendment right." *Id*. at *8.

[7] Indeed, "it is *easy* to imagine many situations in which an un-*Mirandized* suspect in custody may make self-incriminating statements without any hint of compulsion." *Vega*, 2022 WL 2251304 at *4 (emphasis added). And the requisite warnings "include[] components . . . that do not concern self-incrimination *per se* but are instead plainly designed to safeguard that right." *Id*.

significant way." *Miranda*, 384 U.S. 444, 86 S. Ct. at 1612. "A suspect is . . . 'in custody' for *Miranda* purposes when placed under formal arrest or when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest." *United States v. Wright*, 777 F.3d 769, 774 (5th Cir. 2015) (quoting *United States v. Bengivenga*, 845 F.2d 593, 596 (5th Cir. 1988) (en banc)) (alterations in original). Restraint on freedom of movement usually resembles formal arrest when, "in light of the objective circumstances of the interrogation, . . . a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." *Howes*, 565 U.S. at 509, 132 S. Ct. at 1189 (internal quotation marks and citations omitted) (alteration in original).

The freedom-of-movement test, however, "identifies only a necessary and not a sufficient condition for *Miranda* custody." *Shatzer*, 559 U.S. at 112, 130 S. Ct. at 1224. That is because "[f]idelity to the doctrine announced in *Miranda* requires that it be enforced strictly, but only in those types of situations in which the concerns that powered the decision are implicated." *Berkemer*, 468 U.S. at 437, 104 S. Ct. at 3148-49. Courts must therefore also assess whether the environment surrounding the questioning implicated the concerns identified in *Miranda*. *See Howes*, 565 U.S. at 509-13, 132 S. Ct. at 1189-92 (2012); *Shatzer*, 559 U.S. at 112-14, 130 S. Ct. at 1224-25; *Berkemer*, 468 U.S. at 435-42, 104 S. Ct. at 3147-52.

Moreover, "when [the Supreme] Court creates a prophylactic rule to protect a constitutional right, the relevant 'reasoning' is the weighing of the rule's benefits against its costs." *Montejo v. Louisiana*, 556 U.S. 778, 793, 129 S. Ct. 2079, 2089 (2009). In other words, *Miranda* represents a judicially created rule that "is justified only by reference to its prophylactic purpose, . . . and applies only where its benefits outweigh its costs[.]"

*Shatzer*, 559 U.S. at 106, 130 S. Ct. 1220 (internal quotation marks and citations omitted); *see also Connecticut v. Barrett*, 479 U.S. 523, 528, 107 S. Ct. 828, 832 (1987) (citing *New York v. Quarles*, 467 U.S. 649, 654, 104 S. Ct. 2626, 2630 (1984)). The Court recently surveyed a wide swath of its post-*Miranda* decisions and demonstrated that "all [of them] . . . engaged in cost-benefit analysis to define the scope of these prophylactic rules." *Vega*, 2022 WL 2251304 at *7.

The district court here confined its analysis to the first inquiry, holding that a reasonable person in Coulter's position would have thought that he was in custody as contemplated by *Miranda*.[8] The district court then failed to proceed to the second inquiry after finding this "necessary but not sufficient" condition to suppressing Coulter's statements. *See Shatzer*, 559 U.S. at 112, 130 S. Ct. at 1224.

We hold, however, that the district court erred in determining that Coulter was in custody. And even if it did not err as to the first inquiry, the second inquiry under *Miranda* precedents would reject suppression. As to the second inquiry, Officer Guzman did not question Coulter in an environment resembling the station house questioning at issue in *Miranda*. *See Berkemer*, 468 U.S. at 437-42, 104 S. Ct. at 3147-52. Coulter's unwarned statements are therefore admissible.

## A.

When a court assesses whether a suspect is in custody as contemplated by *Miranda*, "[t]he requisite restraint on freedom is greater than that required in the Fourth Amendment seizure context." *Wright*,

---

[8] The district court also held that the public safety exception to *Miranda* did not apply. The government does not challenge this determination on appeal, so this court need not consider the exception.

777 F.3d at 774 (citation omitted). A custodial determination in the *Miranda* context involves "an objective determination, depending on the totality of the circumstances, that looks to the circumstances surrounding the interrogation and whether, given the circumstances, a reasonable person would have felt he was at liberty to terminate the interrogation and leave." *Nelson*, 990 F.3d at 955 (citing *Wright*, 777 F.3d at 774). In other words, the court must consider whether "a reasonable person in the suspect's position would have understood the situation to constitute *a restraint on freedom of movement of the degree which the law associates with formal arrest.*" *Bengivenga*, 845 F.2d at 596 (emphasis added). "The reasonable person through whom [the court] view[s] the situation must be neutral to the environment and to the purposes of the investigation—that is, neither guilty of criminal conduct and thus overly apprehensive nor insensitive to the seriousness of the circumstances." *Id.* Neither the officer's nor the suspect's subjective intent "is relevant to the custody determination." *United States v. Chavira*, 614 F.3d 127, 133 (5th Cir. 2010) (citing *Bengivenga*, 845 F.2d at 597). Because no single fact or circumstance results in *Miranda* custody, "this court has repeatedly considered certain key details" encapsulated by the following factors:

- *First,* the length of the questioning;
- *Second,* the location of the questioning;
- *Third,* the accusatory, or non-accusatory, nature of the questioning;
- *Fourth,* the amount of restraint on the individual's physical movement; and
- *Fifth,* statements made by officers regarding the individual's freedom to move or leave.

*Wright*, 777 F.3d at 775 (citations omitted).

While citing four of these factors, the district court found decisive in favor of its custody determination only the fourth and fifth factors. For the sake of completeness, we consider each factor in turn, because taken together, they paint a picture at odds with the district court's constrained view. The factors holistically evince the non-threatening, non-aggressive approach of Officer Guzman, who, facing alone, on a dark street, a man who admitted a prior conviction for aggravated robbery, reasonably took precautions for officer safety. The precaution of handcuffing, under these circumstances, did not restrain Coulter's freedom of movement to "the degree which the law associates with formal arrest." *Bengivenga*, 845 F.2d at 596.

The district court failed to consider the first factor, the *length of the questioning,* but this factor plainly does not suggest the equivalent of formal arrest. Approximately fifteen minutes elapsed between Officer Guzman's first contact with Coulter and Coulter's admission that he had a pistol in his backpack. This court has warned against "[o]verreliance upon the length of [questioning]" because doing so "injects a measure of hindsight into the analysis which [it] wish[es] to avoid." *United States v. Harrell*, 894 F.2d 120, 124 n.1 (5th Cir. 1990). While "a detention of approximately an hour raises considerable suspicion[,]" *id.*, a thirty-minute interview "suggests [that a suspect] was *not* in custody." *United States v. Ortiz*, 781 F.3d 221, 233 (5th Cir. 2015) (citation omitted) (emphasis added). Based on these authorities, the comparatively brief questioning here is incompatible with finding that Coulter was in custody pursuant to *Miranda*.

The *location of the questioning* did not suggest, even to the district court, that a reasonable person in Coulter's position would have equated it with formal arrest. "Interrogations in public settings are less police dominated than stationhouse interrogations; the public nature reduces the

hazard that officers will resort to overbearing means to elicit incriminating responses and diminishes the individual's fear of abuse for failure to cooperate." *Chavira*, 614 F.3d at 135 (citing *Bengivenga*, 845 F.2d at 598). Thus, "[t]he fact that an interview takes place in a public location weighs against the conclusion that a suspect is in custody . . . ." *Ortiz*, 781 F.3d at 231 (citing *Berkemer*, 468 U.S. at 438, 104 S Ct. at 3149). Officer Guzman questioned Coulter while he stood on a neighborhood street. In fact, the questioning took place in front of the home where Coulter apparently lived with his parents. Later, his mother "came out[side] and [officers] released the van to her." We have also noted that a smaller number of officers mitigates a suspect's "sense of vulnerability." *Bengivenga*, 845 F.2d at 598 (citation omitted). No other officers were present during Officer Guzman's questioning of Coulter.[9] This factor weighs against finding Coulter was in custody as contemplated by *Miranda*.

Regarding the third factor, the district court found that the non-accusatory *nature of the questioning* did not suggest that a reasonable person in Coulter's position would have equated it with formal arrest. The district court determined that Officer Guzman "was merely appealing to Coulter's interests in being truthful and helpful during the search, rather than engaging in formal questioning." We agree.

Officer Guzman initially asked Coulter how he was doing, whether he was alone, and (twice) whether he had any guns before he learned Coulter was a felon. He then asked Coulter to provide some identification and to

---

[9] One other officer arrived on scene to search the van after Coulter told Officer Guzman where his gun was located. Officer Guzman suggested that "backup" was "right around the corner[,]" but there is no indication that more than two officers were present. And the second officer's role was apparently limited to searching the van rather than interacting with Coulter.

explain who owned the van and where he came from.  Officer Guzman also asked about his job once Coulter said he had just left work and that the van belonged to his boss.  Officer Guzman inquired about Coulter's criminal record only after Coulter admitted that he was on parole for aggravated robbery.  Following that admission, Officer Guzman again asked, and Coulter denied that he had a gun.  Officer Guzman then asked Coulter whether he had anything illegal in the van, including drugs.  Officer Guzman conveyed that he did not care about "a gram of weed [] or something stupid," which implied that he would have released Coulter if that was all he had.  Officer Guzman also emphasized that he wanted Coulter to "be honest[]" and "real upfront with [him]."  Coulter agreed that he "want[ed] to be real with [Officer Guzman]" and Officer Guzman asked again whether he had a gun.  Though Coulter did not answer affirmatively, his hesitancy prompted Officer Guzman to handcuff him and ask whether Coulter understood that he was just detained to minimize the risk of his running for the gun.  Shortly afterward,  Coulter reiterated that he still "want[ed] to be real with [Officer Guzman]" and acknowledged that a gun was in his backpack.  Even after he handcuffed Coulter, the video and transcript plainly demonstrate that the tenor of Officer Guzman's inquiries never became accusatory, much less threatening.

The *amount of restraint* on Coulter's physical movement, from the point at which he was handcuffed, led to the district court's decision to suppress his post-handcuffing statements.  This factor presents a more nuanced question, but in the end, it does not compel a conclusion that a reasonable person in Coulter's position would have equated the restraint on his movement with formal arrest.  This court has held to the contrary, that "the brief handcuffing of a suspect does not render an interview custodial *per se*[]." *Michalik*, 5 F.4th at 589 n.3 (citing *Ortiz*, 781 F.3d at 231-33).  And the Supreme Court generally recognizes that "[n]ot all restraints on freedom of

movement amount to custody for purposes of *Miranda*." *Howes*, 565 U.S. at 509, 132 S. Ct. at 1189. Indeed, "[s]ome *significant* restraint of freedom of movement must have occurred." *United States v. Howard*, 991 F.2d 195, 200 (5th Cir. 1993) (citation omitted) (emphasis added). For example, this court determined that a suspect was not in *Miranda* custody even though officers approached him with their guns drawn and handcuffed him for five to ten minutes before removing the handcuffs and initiating questioning.[10] *Ortiz*, 781 F.3d at 224-25, 232-33.

To be more precise, this court has not considered whether a suspect questioned while in handcuffs during a valid traffic stop is in *Miranda* custody. Here, Officer Guzman had a substantial conversation with Coulter before placing him in handcuffs. And at that time, Officer Guzman explained that the handcuffs were necessary because he did not want Coulter "to run up and grab the gun[,]" or "wind up fighting with [Coulter]." Importantly, Coulter replied "[y]ou're cool." Such a response does not convey that Coulter equated the handcuffs with formal arrest. While Coulter offered to distance himself farther from Guzman instead of being handcuffed, the dash camera video reveals that he never attempted to move.[11] Coulter also never asked or attempted to end the encounter. He remained standing in the street without being forced on the ground or into Officer Guzman's vehicle. Under

---

[10] Under other circumstances, this court determined that "the experience of being singled out and handcuffed would color a reasonable person's perception of the situation and create a reasonable fear that the handcuffs could be reapplied at any time." *United States v. Cavazos*, 668 F.3d 190, 195 (5th Cir. 2012) (citation omitted). But that determination arose where over a dozen officers entered a suspect's bedroom and immediately handcuffed him while executing a search warrant, though they removed the handcuffs prior to interrogation. *Id*. at 194-95.

[11] The dashboard camera video also reveals that Coulter initially leaned against Officer Guzman's vehicle with his hands crossed behind his back for several minutes (as if he were already handcuffed) even though Officer Guzman never told him to do so.

the circumstances, objective concerns for officer safety necessitated the amount of restraint generated by the handcuffs, Coulter implicitly acknowledged the limited purpose of the restraint, and a reasonable person in his position would not have equated such restraint with formal arrest. The district court erred by ruling otherwise.

Consistent with our conclusion, four other circuits recognize that a suspect is not necessarily in *Miranda* custody when being questioned while handcuffed. The First Circuit, for example, held that a suspect was not in *Miranda* custody when an officer stopped the suspect on a busy public road, drew his gun, handcuffed the suspect for ten to fifteen minutes, frisked the suspect, and questioned the suspect while he was handcuffed. *United States v. Fornia-Castillo*, 408 F.3d 52, 64-65 (1st Cir. 2005). The Fourth Circuit has long held that "drawing weapons, handcuffing a suspect, placing a suspect in a patrol car for questioning, or using or threatening to use force does not necessarily elevate a lawful stop into a custodial arrest for *Miranda* purposes." *United States v. Leshuk*, 65 F.3d 1105, 1109–10 (4th Cir. 1995) (citations omitted).[12] And the Ninth Circuit determined that suspects were not in *Miranda* custody even though officers frisked, handcuffed, and separately questioned them for ten to twelve minutes on the street. *United States v. Bautista*, 684 F.2d 1286, 1287-88, 1292 (9th Cir. 1982). In reaching its conclusion, the Ninth Circuit reasoned that "[h]andcuffing a suspect does not necessarily dictate a finding of custody . . . . [because] [s]trong but reasonable measures to insure the safety of the officer or the public can be

---

[12] The Sixth Circuit, in reviewing a post-conviction *habeas* petition, determined that it "was not unreasonable" to conclude that a suspect was not in *Miranda* custody even though the officer drew his gun, questioned the suspect while handcuffed, and placed the suspect in the back of his patrol car. *Loza v. Mitchell*, 766 F.3d 466, 474-77 (6th Cir. 2014) (citations omitted).

taken without necessarily compelling a finding that the suspect was in custody." *Id*. at 1292 (internal quotation marks and citation omitted).

Fifth, we must disagree with the district court's finding that Officer Guzman's *statements regarding Coulter's freedom to move or leave* "weigh[ed] in favor of finding that [Coulter] was in custody." To begin, assurances that a suspect "[is] not under arrest and that he [is] free to leave" weigh in favor of determining that a suspect is not in custody. *Wright*, 777 F.3d at 777. Informing a suspect he is "not under arrest, [even without] explicitly tell[ing] him he [is] free to leave[,] . . . . would [also] suggest to a reasonable person that he [is] free to leave[.]" [13] *Ortiz*, 781 F.3d at 231 (citation omitted). Here, Officer Guzman placed Coulter in handcuffs and explained that it was "[j]ust detainment." He then twice reassured Coulter that he was "just detained." And, most important, Coulter confirmed that he understood what being "detained" meant. Coulter could have asked for clarification or simply said "no," but he just said "[y]eah[,]" which clearly suggests Coulter understood that he was not in custody as contemplated by *Miranda*.

The district court heavily relied on Officer Guzman's statement, after he handcuffed Coulter, "not to pull away, because Officer Guzman did not 'want to tase [sic] [him.]'" Coulter asserts now that he understood the statement to warn that "an attempt to leave could result in being tased." [14] This isolated statement could create an inference that Coulter may have been in *Miranda* custody. But "no one fact is determinative," *Wright*, 777 F.3d at

---

[13] This court has also held that, "to a reasonable lay person, the statement that an interview is 'non-custodial' is not the equivalent of an assurance that he could 'terminate the interrogation and leave.'" *Cavazos*, 668 F.3d at 195 (quoting *J.D.B. v. North Carolina*, 564 U.S. 261, 270, 131 S. Ct. 2394, 2402 (2011)).

[14] There is no indication that Officer Guzman actually reached for his taser or gun at any point.

775, and Coulter immediately replied,"[t]hat's fine." This contemporaneous response, like Coulter's conveying that Officer Guzman was "cool" when he handcuffed Coulter, objectively indicates that Coulter did not equate the tasing statement with formal arrest as events unfolded. Indeed, no reasonable person would tell an officer that he was "cool" or "fine" with being essentially arrested. And it is hard to conceive that a reasonable person, while handcuffed, would tell an officer that he "want[ed] to be real with [him]" if he thought he was already under arrest. Unlike the district court, we conclude, based on the men's interactions, that Officer Guzman's conversation with and statements to Coulter were not indicative of the restraint associated with formal arrest.

Based on the totality of the circumstances viewed in the light most favorable to Coulter, a reasonable person in his position would not have equated the situation with formal arrest. But, even if the opposite were true, determining whether Coulter's "freedom of movement was curtailed [would only be] the first step in the analysis, not the last." *Howes*, 565 U.S. at 509, 132 S. Ct. at 1189. The district court failed to complete the analysis.

**B.**

Assuming *arguendo* that a reasonable person in Coulter's position would have equated the situation with formal arrest, the court must next determine "whether the relevant environment [in which Coulter was questioned] present[ed] the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Id.* at 565 U.S. at 509, 132 S. Ct. at 1189-90. The government maintains that the environment in which Officer Guzman questioned Coulter did not necessitate *Miranda* warnings and faults the district court's having overlooked this inquiry.

The Supreme Court holds that officers generally need not issue *Miranda* warnings before questioning motorists and passengers during a

routine traffic stop.  Because "a traffic stop is presumptively temporary and brief[,] . . . . questioning incident to an ordinary traffic stop is quite different from stationhouse interrogation, which frequently is prolonged, and in which the detainee often is aware that questioning will continue until he provides his interrogators the answers they seek." *Berkemer*, 468 U.S. at 437-38, 104 S. Ct. at 3149 (citation omitted).  Moreover, because "the typical traffic stop is public, at least to some degree[,] . . . . the atmosphere surrounding an ordinary traffic stop is substantially less police dominated than that surrounding the kinds of interrogation at issue in *Miranda* itself . . . and in the subsequent cases in which [the Supreme Court has] applied *Miranda*."  *Id.* at 468 U.S. at 438-39, 104 S Ct. at 3149-50 (internal quotation marks and citations omitted).   In other words, "the temporary and relatively nonthreatening detention involved in a traffic stop or *Terry* stop . . . does not constitute *Miranda* custody." *Shatzer*, 559 U.S. at 113, 130 S. Ct. at 1224 (citations omitted).  But, once "a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him in custody for practical purposes, he will be entitled to the full panoply of protections prescribed by *Miranda*." *Berkemer*, 468 U.S. at 440, 104 S. Ct. at 3150 (internal quotation marks and citation omitted).

The environment in which Officer Guzman questioned Coulter did not present the same inherently coercive pressures as the station house questioning at issue in *Miranda*.  Unlike station house interrogations, the encounter between Officer Guzman and Coulter lasted only approximately fifteen minutes.  And unlike the atmosphere surrounding a station house interrogation, Coulter remained standing in the street in front of his parents' home during the entire encounter.  Faced with strikingly similar circumstances, the Ninth Circuit determined that similar facts "f[e]ll short of the sorts of police dominated and compelling atmospheres presented in the four cases under review in *Miranda v. Arizona*." *Bautista*, 684 F.2d at

1292 (citing *Miranda*, 384 U.S. at 491-99, 86 S. Ct. at 1636-40). Additionally, as this court noted when considering a somewhat similar manner in which suspects were detained, "except for the fact that [officers] briefly displayed their guns, the circumstances were similar to those of an ordinary traffic stop, a situation in which a suspect is not in custody." *Ortiz*, 781 F.3d at 232 (citing *Berkemer*, 468 U.S. at 440, 104 S. Ct. at 3150). It is noteworthy that officers frisked and handcuffed the *Ortiz* defendant for five to ten minutes, and although officers did not question him while handcuffed, this court clearly did not understand the handcuffs to transform a traffic stop into formal custody. 781 F.3d at 225, 232-33.

## IV. CONCLUSION

For the reasons stated above, a reasonable person in Coulter's position would not have equated the restraint on his freedom of movement with formal arrest. But even if Coulter could have reasonably thought that he was in custody for *Miranda* purposes after being handcuffed, the environment in which Officer Guzman questioned him was not tantamount to a station house interrogation as contemplated by *Miranda*. All of Coulter's unwarned statements are therefore admissible. The district court's judgment suppressing those statements is REVERSED.

No. 20-10999

Edith H. Jones, *Circuit Judge*, concurring:

In addition to the preceding discussion, which demonstrates that suppression is unwarranted, I believe this case is a particularly poor vehicle for any conclusion that Coulter was "in custody" when he made unsolicited admissions about illegally possessing a gun. The panel is deeply divided on the application of the "custody" test. Under such circumstances, it seems to me, we ought to recall that "[t]he *Miranda* rules are prophylactic rules that the Court found to be necessary to protect the Fifth Amendment right against compelled self-incrimination." ." *Vega v. Tekoh*, 597 U.S. __, __ S. Ct. __, 2022 WL 2251304, *8 (June 23, 2022). Moreover, "when [the Supreme] Court creates a prophylactic rule to protect a constitutional right, the relevant 'reasoning' is the weighing of the rule's benefits against its costs." *Montejo v. Louisiana*, 556 U.S. 778, 793, 129 S. Ct. 2079, 2089 (2009). The *Miranda* rule is therefore "justified only by reference to its prophylactic purpose, . . . and applies only where its benefits outweigh its costs[.]" *Maryland v. Shatzer*, 559 U.S. 98, 106, 130 S. Ct. 1213, 1220 (2010) (internal quotation marks and citations omitted); *see also Connecticut v. Barrett*, 479 U.S. 523, 528, 107 S. Ct. 828, 832 (1987) (citing *New York v. Quarles*, 467 U.S. 649, 654, 104 S. Ct. 2626, 2630 (1984)). When three judges cannot agree on whether a suspect in a traffic stop is "in custody," then we ought to consider the costs and benefits of suppressing incriminatory statements. What are the benefits of suppression where the obvious consequence in this case would be to leave law enforcement officers without guidance in this most common type of citizen-police encounter?

The costs of suppressing Coulter's unwarned statements would be substantial, namely, hindering the prosecution of a convicted felon who voluntarily admitted to possessing a firearm and drugs. Society has a "compelling interest in finding, convicting, and punishing those who violate the law." *Moran v. Burbine*, 475 U.S. 412, 426 , 106 S. Ct. 1135, 1143 (1986).

20

Federal courts "are, after all, always engaged in a search for truth in a criminal case . . . ." *Oregon v. Hass*, 420 U.S. 714, 722, 95 S. Ct. 1215, 1221 (1975). Thus, "far from being prohibited by the Constitution, admissions of guilt by wrongdoers, if not coerced, are *inherently desirable*." *United States v. Washington*, 431 U.S. 181, 187, 95 S. Ct. 1814, 1818 (1977) (emphasis added). Put another way, "the ready ability to obtain uncoerced confessions is not an evil but an *unmitigated good*[.]" *McNeil v. Wisconsin*, 501 U.S. 171, 181, 111 S. Ct. 2204, 2210 (1991) (emphasis added). Coulter's repeated intentions to "be real" with Officer Guzman amply demonstrate that his unwarned statements were voluntary.

Further, the videotape of this entire encounter compellingly shows there was no improper compulsion or restraint. Officer Guzman did not coerce Coulter into disclosing the location of his gun. He was alone in the dark with Coulter and asked him twice about gun possession, even before he learned Coulter was a felon previously convicted of aggravated robbery. The motivation for officer safety was plain in his questioning and ultimate handcuffing. Officer Guzman never raised his voice, nor did he threaten or accuse Coulter. In repeatedly stating that his purpose was limited to "detainment," his tone was matter-of-fact rather than heavy-handed. Indeed, Officer Guzman specifically told Coulter he was worried about Coulter's "run[ning] up and grab[bing] the gun" and "fighting with [him]." At that point, Officer Guzman already knew about Coulter's aggravated robbery conviction and that he had a knife. "Although the courts ensure compliance with the *Miranda* requirements . . . it is police officers who must actually decide whether or not they can question a suspect." *Davis v. United States*, 512 U.S. 452, 461, 114 S. Ct. 2350, 2356 (1994). To hold that Officer Guzman should have provided Coulter with *Miranda* warnings before asking basic questions implicating his safety would unduly collapse those two distinct roles into one.

If handcuffing suspects, after a valid traffic stop yields probable cause to search a car, requires the issuance of *Miranda* warnings, then what about placing the suspects on the ground or on their knees, hands raised, with a weapon unholstered?  What about instructing a suspect to sit in the officer's vehicle during a search?  All of these are alternative tactics to ensure officer safety, yet, under the district court's reasoning, all could arguably constitute "custody" under *Miranda*.  Officers might be put to the choice of ensuring their own safety or conducting routine investigations.  One potential price of premature *Mirandizing* would be to require broader vehicle searches, and thus broader invasions of privacy, because officers would likely lack voluntary admissions from suspects.  Prematurely requiring *Miranda* warnings during traffic stops would also inhibit questioning that could assist in time-sensitive investigations, e.g., for kidnapping victims or terrorists.  Suppressing Coulter's unwarned statements, under circumstances like those before us, would therefore needlessly burden law enforcement officers and imprudently hinder the investigation of crime.

Finally, suppressing Coulter's unwarned statements under these circumstances would also yield no meaningful societal or judicial benefits.  "[U]nlike unreasonable searches under the Fourth Amendment or actual violations of the Due Process Clause or the Self-Incrimination Clause, there is, with respect to mere failures to warn, *nothing to deter*."  *United States v. Patane*, 542 U.S. 630, 642, 124 S. Ct. 2620, 2629 (2004) (plurality opinion) (emphasis added).  Here, under applicable law, there was nothing to deter and therefore no justification for suppressing Coulter's un-*Mirandized* statements.

No. 20-10999

Priscilla Richman, *Chief Judge*, dissenting:

The restrictions placed on Braylon Ray Coulter during a traffic stop were of the degree associated with a formal arrest.[1] When Coulter offered to walk away from his van before Officer Nino de Guzman searched it, Officer Guzman told him to turn around and face the squad car. He told Coulter that he had backup around the corner. He also warned Coulter not to pull away because, if he did, Officer Guzman would "have to tase" him. Then Officer Guzman put Coulter in handcuffs. Guzman asked incriminating questions but at no point read Coulter his *Miranda* rights. Because the totality of the restraints imposed on Coulter amounted to custody, I would affirm the district court's suppression of Coulter's post-handcuffing statements, especially in light of our deference to lower courts on motions to suppress. I respectfully dissent.

## I

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself."[2] To safeguard the privilege against self-incrimination and counteract the "inherently compelling pressures" of custodial interrogation, suspects interrogated in police

---

[1] *See California v. Beheler*, 463 U.S. 1121, 1125 (1983) (explaining that "[a]lthough the circumstances of each case must certainly influence a determination of whether a suspect is 'in custody' for purposes of receiving *Miranda* protection, the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest") (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)); *see also Berkemer v. McCarty*, 468 U.S. 420, 435-40 (1984) (holding that "routine" traffic stops are not custodial for *Miranda* purposes but that if a motorist is "subjected to treatment that renders him 'in custody' for practical purposes, he will be entitled to the full panoply of protections prescribed by *Miranda*").

[2] U.S. Const. amend. V.

custody are entitled to procedural safeguards.[3] Statements stemming from custodial interrogation without *Miranda* warnings may not be used as evidence to establish guilt.[4]

The protections provided by *Miranda* are limited to custodial interrogation.[5] Custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."[6] It is "a term of art that specifies circumstances that are thought generally to present a serious danger of coercion."[7] These circumstances exist when a suspect is "placed under formal arrest or when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest."[8]

We traditionally engage in a two-part inquiry to determine whether an individual is in custody.[9] First, under the freedom-of-movement test, we ask if a reasonable person would feel free to terminate the police encounter and leave.[10] Second, we ask "whether the relevant environment presents the

---

[3] *Miranda v. Arizona*, 384 U.S. 436, 444, 467 (1966) (holding that officers must inform suspects that they have a right to remain silent, that anything they say may be used as evidence against them, and that they are entitled to the presence of an attorney, either retained or appointed, during the interrogation).

[4] *Id.* at 444.

[5] *Id.*

[6] *Id.*

[7] *Howes v. Fields*, 565 U.S. 499, 508-09 (2012).

[8] *United States v. Bengivenga*, 845 F.2d 593, 596 (5th Cir. 1988) (en banc).

[9] *See United States v. Arellano-Banuelos*, 927 F.3d 355, 359-60 (5th Cir. 2019).

[10] *Howes*, 565 U.S. at 509.

same inherently coercive pressures as the type of station house questioning at issue in *Miranda*."[11]

In assessing whether a *Miranda* warning was required in a specific case, we determine: "first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave."[12]  The former is a question of fact reviewed for clear error, the latter a question of law reviewed de novo.[13]  "The reasonable person through whom we view the situation must be neutral to the environment and to the purposes of the investigation—that is, neither guilty of criminal conduct and thus overly apprehensive nor insensitive to the seriousness of the circumstances."[14]  The custody inquiry is objective; the subjective views of the officer and suspect are "irrelevant."[15]

Routine traffic stops are not custodial.[16]  "[T]he temporary and relatively nonthreatening detention involved in a traffic stop . . . does not constitute *Miranda* custody."[17]  In other words, "a Fourth Amendment seizure does not necessarily render a person in custody for purposes of *Miranda*."[18] But traffic stops may become custodial.  "If a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him

---

[11] *Id.*

[12] *Thompson v. Keohane*, 516 U.S. 99, 112 (1995) (footnote omitted).

[13] *Id.* at 112-13; *United States v. Nelson*, 990 F.3d 947, 952 (5th Cir. 2021).

[14] *United States v. Bengivenga*, 845 F.2d 593, 596 (5th Cir. 1988) (en banc).

[15] *J.D.B. v. North Carolina*, 564 U.S. 261, 271 (2011).

[16] *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984).

[17] *Maryland v. Shatzer*, 559 U.S. 98, 113 (2010).

[18] *Bengivenga*, 845 F.2d at 598.

No. 20-10999

'in custody' for practical purposes, he will be entitled to the full panoply of protections prescribed by *Miranda*."[19]

We have "repeatedly considered certain key details" when analyzing whether an officer's conduct during a traffic stop moved the encounter beyond "routine" to "in custody" for purposes of *Miranda*: "(1) the length of the questioning; (2) the location of the questioning; (3) the accusatory, or non-accusatory, nature of the questioning; (4) the amount of restraint on the individual's physical movement; [and] (5) statements made by officers regarding the individual's freedom to move or leave."[20] This is a "totality of circumstances"[21] inquiry in which "no one fact is determinative."[22]

I agree with the majority opinion that the first two factors would lead a reasonable person in Coulter's position to think that he was not in custody, but I part company on the analysis of the remaining three. The accusatory nature of Officer Guzman's questions, handcuffing, and threatening statements made by Officer Guzman outweigh the brief and public nature of his questioning. In their totality, the circumstances surrounding the stop placed Coulter in *Miranda* custody.

First, regarding the accusatory nature of the questioning, it is important to know what transpired *before* Coulter was handcuffed. Coulter told Officer Guzman that he had pled guilty to and was on parole for aggravated robbery. There was then a discussion about Coulter's marijuana use. Officer Guzman told Coulter that the vehicle smelled like marijuana and that gave

---

[19] *Berkemer*, 468 U.S. at 440.

[20] *United States v. Wright*, 777 F.3d 769, 775 (5th Cir. 2015) (internal citations omitted).

[21] *Id.* at 774 (quoting *United States v. Cavazos*, 668 F.3d 190, 193 (5th Cir. 2012)).

[22] *Id.* at 775.

Officer Guzman probable cause to search him and the vehicle. Officer Guzman then said, "I want you to be real with me, because I am going to search it." Coulter then said, "You told me to be real with you and everything. . . . I mean, I don't need no more strikes." Officer Guzman then asked, "What you got?" and "Is it a gun?" to which Coulter replied, "If I tell you that, I mean, I'm losing. I don't want to lose." After further brief discussion about what gun possession meant regarding violations of parole, Coulter then said, "Look, I ain't [indiscernable] nobody in trouble. I done had people trying to kill me. So I'm saying at the same time, I don't --- I don't want to be caught out there with nothing." Both men clearly understood this to be an admission that Coulter had a gun in the vehicle. At this point Officer Guzman said, "Look, what I'm going to do is I'm just going to detain you all right? Because I don't want you . . . to run up and grab the gun and then . . . ." It was then that Coulter offered to walk away but Officer Guzman ordered him to "[t]urn around and face my car" multiple times, told Coulter that backup had been called, said that he did not want to end up fighting with Coulter and that if Coulter tried to pull away, Officer Guzman would tase him. The district court did not suppress any of Coulter's statements up to this point, and Coulter does not contend that they are inadmissible.

Accordingly, the record reflects that after Coulter admitted he was a convicted felon on parole, and after he had essentially admitted there was a gun in the vehicle, Officer Guzman asked Coulter while handcuffed "where's the gun at" to which Coulter replied "it's in my backpack." Officer Guzman then said, "In your backpack? You are a convicted felon?" Officer Guzman subsequently said to Coulter, "it's our constitutional right [to carry a gun]. But you lost that constitutional right, when you were convicted a felon [sic]." Coulter then asserted, "I ain't never once pulled it on nobody." There were further exchanges about the gun, including Coulter's claim that it was for protection and Coulter's request for Officer Guzman to

"take the gun." It is these statements, after Coulter was handcuffed, that the district court suppressed.

Asking a known felon if he is in possession of a gun is asking an incriminatory question. It is an inculpatory question. No matter how calmly asked or the tone of voice used, the question is an incriminatory, accusatory one.

Second, regarding restraints on physical movement, handcuffing by itself does not automatically render a suspect in *Miranda* custody, but it supports that conclusion.[23] Even if someone is not immediately handcuffed during a traffic stop, his eventual handcuffing "suggest[s] to a reasonable person that he was not free to leave."[24] Coulter was not handcuffed at the beginning of the traffic stop, but when he asked if he could walk away, Officer Guzman immediately told him to "[t]urn around and face my car." Two seconds after that, Officer Guzman stated that he had backup "right around the corner." After another five seconds, Officer Guzman said that he did not want to "wind up fighting with" Coulter. Then, ten seconds later, Officer Guzman told Coulter not to "pull away . . . because [he] did not want to have to tase [Coulter] and do a bunch of paperwork." At that point, even though Officer Guzman was about to search for a gun in Coulter's van, a reasonable person in Coulter's shoes would have thought that he was in police custody. Officer Guzman also never unhandcuffed Coulter once he began interrogating him. Accordingly, a reasonable person in Coulter's shoes would have thought that he was not free to terminate the encounter and leave.

---

[23] *United States v. Ortiz*, 781 F.3d 221, 231 (5th Cir. 2015).

[24] *Id.*

The majority opinion cites cases that suggest handcuffing is not dispositive of the five-factor custody inquiry.[25]  As noted above, I agree.  But from this, the majority opinion concludes that the fourth factor (the amount of restraint on an individual's physical movement) itself does not weigh in favor of custody.[26]  That handcuffing alone may be insufficient to establish custody does not mean that it is irrelevant.  In this circuit, when a suspect is handcuffed, the "amount of restraint on the individual's physical movement" weighs in favor of custody.[27]

The majority opinion also inappropriately draws several inferences in a light that is unduly favorable to the government to conclude the fourth factor weighs against custody.  On an appeal of a motion to suppress, we must view "the evidence in the light most favorable to the party that prevailed in the district court."[28]  We must also "uphold the district court's ruling on the motion 'if there is any reasonable view of the evidence to support it.'"[29]  "Our review is *particularly* deferential where denial of the suppression motion is based on live oral testimony . . . because the judge had the opportunity

---

[25] *Ante*, at 13-14 (majority opinion) (citing *United States v. Michalik*, 5 F.4th 583, 589 n.3 (5th Cir. 2021) ("[T]he brief handcuffing of a suspect does not render an interview custodial *per se*[].").

[26] *Ante*, at 15-16.

[27] *Ortiz*, 781 F.3d at 229-30; *see also id.* at 231 ("[T]he fact that the agents eventually handcuffed him would suggest to a reasonable person that he was not free to leave."); *United States v. Cavazos*, 668 F.3d 190, 194 (5th Cir. 2012) ("Cavazos was immediately located and handcuffed at the start of the search, demonstrating that the agents sought out Cavazos and had physical dominion over him.").

[28] *United States v. Michalik*, 5 F.4th 583, 588 (5th Cir. 2021) (quoting *United States v. Chavez*, 281 F.3d 479, 483 (5th Cir. 2002)).

[29] *Id.* (quoting *United States v. Michelletti*, 13 F.3d 838, 841 (5th Cir. 1994) (en banc)).

to observe the demeanor of the witnesses."[30] I recognize that the district court relied on live oral testimony from its May 2020 hearing on Coulter's first motion to suppress when it entered its October 2020 order denying Coulter's subsequent motion to suppress his statements. But the application of our "particularly deferential" standard of review is still appropriate. The district judge had the "opportunity to observe" Officer Guzman's demeanor at the first hearing, and it "based" its October 2020 denial in part on that testimony.[31]

The majority opinion infers that Coulter "implicitly acknowledged the limited purpose" of his handcuffs because he never attempted to move away from his van.[32] But there was only a one second gap between Coulter's offer to move away and Officer Guzman's command to "[t]urn around and face my car." That is not enough time to move away, especially when the circumstances are construed in the light most favorable to Coulter. Additionally, the majority infers from Coulter saying "[y]ou're cool" to Officer Guzman that Coulter did not "equate[] the handcuffs with formal arrest."[33] A more plausible inference is that Coulter sought to avoid harm. Before saying "you're cool," Officer Guzman had just refused to let Coulter move away, told him to face his squad car, indicated that he had backup on the way, and said that he did not want to "wind up fighting" with Coulter. Saying "you're cool" could reasonably be viewed as an effort to deescalate the situation. Coulter's words do not suggest that he thought he was free to leave, especially when considered in the light most favorable to him. Lastly, the

---

[30] *United States v. Aguirre*, 664 F.3d 606, 612 (5th Cir. 2011) (emphasis added) (quoting *United States v. Scroggins*, 599 F.3d 433, 440 (5th Cir. 2010)).

[31] *See id.* (quoting *Scroggins*, 599 F.3d at 440).

[32] *Ante*, at 15 (majority opinion).

[33] *Ante*, at 14.

majority opinion emphasizes that Coulter was on parole for aggravated robbery. That is correct, but Coulter told Officer Guzman about the aggravated robbery more than seven minutes before he was handcuffed. During those seven minutes, Officer Guzman repeatedly questioned Coulter about the gun without restraining him. Thus, when Officer Guzman finally put Coulter in handcuffs and told him that he would not let him walk away, a reasonable person would not have thought that he was free to leave.

Moreover, the majority opinion emphasizes that "objective concerns for officer safety necessitated the amount of restraint generated by the handcuffs."[34] The relevant inquiry, however, is whether a "reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and proceed."[35] To the extent that the majority opinion is invoking the *New York v. Quarles*[36] public safety exception, the Government failed to brief this argument and it is therefore forfeited. Regardless, the circumstances of this case do not warrant the application of the "narrow" public safety exception to the *Miranda* rule.[37] Even if "officer safety" is relevant, Officer Guzman certainly had probable cause to handcuff Coulter. Concern for officer safety

---

[34] *Ante*, at 14-15.

[35] *Howes v. Fields*, 565 U.S. 499, 509 (2012) (emphasis added) (quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)).

[36] 467 U.S. 649 (1984).

[37] *Id.* at 658; *see United States v. Lim*, 897 F.3d 673, 691 (5th Cir. 2018) (holding that the public safety exception did not apply because "[t]here [wa]s no indication why the officer[] could not take a moment to provide *Miranda* warnings"); *United States v. Raborn*, 872 F.2d 589, 595 (5th Cir. 1989) ("Unlike the situation in *Quarles* . . . when the gun was hidden in a place to which the public had access, Raborn's truck, where the police officers believed the gun to be, had already been seized and only the police officers had access to the truck. It is difficult therefore, to find that the public-safety exception applies.").

did not give Officer Guzman carte blanche to question Coulter further about the firearm before reciting the *Miranda* rights.

Lastly, under the fifth factor, Officer Guzman's statements about Coulter's freedom to move further demonstrate that a reasonable person would think he was under formal arrest. Explicit assurances that a suspect is "not under arrest" and that he is "free to leave" convey that he is not in custody.[38] Telling a suspect that he is "not under arrest" without specifying that he is "free to leave" also suggests that a suspect is not in custody, although it is "less clear."[39] By contrast, "to a reasonable lay person, the statement that an interview is 'non-custodial' is not the equivalent of an assurance that he could 'terminate the interrogation and leave.'"[40] Such a statement does not defeat custody.

The majority opinion emphasizes that Officer Guzman told Coulter several times that he was "just going to detain" him. Like the phrase "non-custodial," however, Officer Guzman's words did not clearly convey that Coulter could terminate his interrogation and leave. Officer Guzman conveyed the opposite. When Coulter said that he did not want to be detained and offered to walk away from his van, Officer Guzman told Coulter to "[t]urn around and face my car." He then instructed Coulter not to "pull away" because he did not want to "wind up fighting" or "have to tase" Coulter. The majority opinion reasons that when Coulter said "[t]hat's fine" in response to Officer Guzman, the response "objectively indicate[d]

---

[38] *United States v. Wright*, 777 F.3d 769, 777 (5th Cir. 2015).

[39] *United States v. Ortiz*, 781 F.3d 221, 231 (5th Cir. 2015).

[40] *United States v. Cavazos*, 668 F.3d 190, 195 (5th Cir. 2012) (quoting *J.D.B. v. North Carolina*, 564 U.S. 261, 270 (2011)).

that Coulter did not equate the tasing comment with formal arrest."[41]  At minimum, the majority opinion's interpretation does not draw inferences in the light most favorable to Coulter.

The majority opinion also emphasizes that Coulter confirmed he understood what "just going to detain" meant.[42]  But the subjective views of a suspect are "irrelevant."[43]  What matters is "how a reasonable person in the suspect's position would understand his freedom to terminate questioning and leave."[44]  The district court correctly determined that Officer Guzman's assertions of control over Coulter's movement objectively weigh in favor of custody.

A conclusion that Coulter was in custody would not create a circuit split.  The Fourth and Ninth Circuits have held that handcuffing by itself does not per se place an individual in *Miranda* custody.[45]  Here, Coulter was in custody based on the totality of the circumstances, including verbal statements by Officer Guzman—not handcuffing alone.  The First Circuit's caselaw is similarly distinguishable.  In *United States v. Fornia-Castillo*,[46] the First Circuit held that a suspect who was handcuffed and questioned was not

---

[41] *Ante*, at 17 (majority opinion).

[42] *Ante*, at 16.

[43] *J.D.B.*, 564 U.S. at 271.

[44] *Id.*

[45] *United States v. Leshuk*, 65 F.3d 1105, 1109-10 (4th Cir. 1995) ("[H]andcuffing a suspect . . . does not necessarily elevate a lawful stop into a custodial arrest for *Miranda* purposes."); *United States v. Bautista*, 684 F.2d 1286, 1292 (9th Cir. 1982) ("Handcuffing a suspect does not necessarily dictate a finding of custody.") (quoting *United States v. Booth*, 669 F.2d 1231, 1236 (9th Cir. 1981)).

[46] 408 F.3d 52 (1st Cir. 2005).

in custody.[47]   Like the Fourth and Ninth Circuits, however, the court reasoned that "handcuffs . . . [do not] necessarily transform[] a valid *Terry* stop into a de facto arrest."[48]   The only other evidence supporting custody was that the officer displayed his gun, but it was "out of [the suspect's] view."[49]   The officers never told the suspect that he could not walk away, and they never threatened to tase him if he did.[50]

Moreover, several of our sister circuits have explained that "pat-down search[es] do[] not establish custody for *Miranda* purposes."[51]   I agree. Viewed in isolation, an officer telling a suspect to "[t]urn around and face my car" is not sufficient to place someone in *Miranda* custody.  But it is not irrelevant.  When viewed in totality with the other restraints on Coulter, including the handcuffs, Officer Guzman's command to "[t]urn around and face my car" instead of granting Coulter's request to walk away supports the district court's decision to suppress Coulter's statements.[52]

Based on the totality of the circumstances viewed in the light most favorable to Coulter, I would hold that after Coulter was handcuffed a reasonable person in his shoes would not have thought he was at liberty to terminate the interrogation and leave.

---

[47] *Id.* at 64-65.

[48] *Id.* at 64.

[49] *Id.*

[50] *See id.* at 56-57, 64-65.

[51] *See, e.g.*, *United States v. Patterson*, 826 F.3d 450, 457 (7th Cir. 2016).

[52] *Cf. id.* at 458 ("The agents never told Patterson he was under arrest or that he was not free to leave, and they never placed him in handcuffs or restrained him in any other physical way which commonly effects an arrest.").

No. 20-10999

## II

"[T]he freedom-of-movement test identifies only a necessary and not a sufficient condition for *Miranda* custody."[53]  At step two of the custody inquiry, we must ask "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*."[54]  Coulter was not in custody for *Miranda* purposes when Officer Guzman first stopped him.  Nor was he in custody during the initial questioning because it was brief, public, and because he was unrestrained. But once Officer Guzman prevented Coulter from walking farther away, handcuffed him, and threatened to tase him, Coulter was "subjected to treatment that render[ed] him 'in custody' for practical purposes."[55]

The majority opinion relies heavily on *United States v. Bautista*,[56] a Ninth Circuit decision, to conclude that the environment in this case is different from the station house interrogation in *Miranda*.  But there are several meaningful differences between *Bautista* and this case.  There, police officers stopped two individuals who were walking on a street near a suspected getaway car from a bank robbery.[57]  The officers in *Bautista* never threatened the defendants with a taser, nor did they affirmatively refuse to let the suspects walk away.[58]  The court in *Bautista* was also reviewing a district court's

---

[53] *Howes v. Fields*, 565 U.S. 499, 509 (2012) (quoting *Maryland v. Shatzer*, 559 U.S. 98, 112 (2010)).

[54] *Id.*

[55] *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984).

[56] 684 F.2d 1286 (9th Cir. 1982).

[57] *Id.* at 1287.

[58] *See id.* at 1287-88.

No. 20-10999

determination that the defendants were *not* in custody.[59]  Here, however, the district court suppressed Coulter unwarned statement, so we must view "the evidence in the light most favorable to the party that prevailed in the district court."[60]

## III

The concurring opinion would introduce a new, case-specific "costs and benefits" analysis into our custody inquiry.[61]  The opinion reasons that *Miranda* is a prophylactic rule such that it applies only when its benefits outweigh its costs.[62]  JUDGE JONES is of course correct that *Miranda* is a prophylactic rule, as the Supreme Court recently clarified in *Vega v. Tekoh*,[63] and that prophylactic rules apply only when the benefits outweigh the costs.[64] As far as I am aware, however, we have never conducted a cost-benefit analysis as part of our *Miranda* custody inquiry.[65]  Nor has the Supreme Court. In its most recent custody case, *Howes v. Fields*,[66] the Court established the

---

[59] *Id.* at 1292.

[60] *United States v. Michalik*, 5 F.4th 583, 588 (5th Cir. 2021) (quoting *United States v. Chavez*, 281 F.3d 479, 483 (5th Cir. 2002)).

[61] *Ante*, at 20-22 (JONES, J., concurring).

[62] *Ante*, at 20.

[63] 142 S. Ct. 2095 (2022).

[64] *Maryland v. Shatzer*, 559 U.S. 98, 106 (2010).

[65] *See, e.g.*, *United States v. Michalik*, 5 F.4th 583, 587-89 (5th Cir. 2021) (never discussing a cost-benefit step in the custody inquiry); *United States v. Arellano-Banuelos*, 927 F.3d 355, 359-63 (5th Cir. 2019) (same); *United States v. Ortiz*, 781 F.3d 221, 229-32 (5th Cir. 2015) (same); *United States v. Wright*, 777 F.3d 769, 773-77 (5th Cir. 2015) (same); *United States v. Cavazos*, 668 F.3d 190, 193-95 (5th Cir. 2012) (same).

[66] 565 U.S. 499 (2012).

second step of the custody inquiry as it referred to *Miranda* as a prophylactic rule.[67]  But it never discussed a cost-benefit analysis.[68]

The Supreme Court's decision in *Vega* does not require a change to that approach.  Rather, *Vega* clarifies that the cost-benefit analysis is appropriate when courts are "charting the dimensions of" the *Miranda* rule.[69]  In other words, a cost-benefit analysis is appropriate in deciding *categorically* whether *Miranda* should be extended or whether exceptions should be recognized.    It is not appropriate on a case-by-case basis once courts have "charted" *Miranda* rules to a particular fact pattern.  For example, consider the *Quarles* "public safety exception" to the *Miranda* rule.  In *Quarles*, the Court weighed the costs and benefits when it determined that *Miranda* need not "be applied in all its rigor to a situation in which police officers ask questions reasonably prompted by a concern for the public safety."[70]  But we do not engage in an additional cost-benefit analysis every time that we decide whether the *Quarles* public safety exception prevents the suppression of un-*Mirandized* statements.[71]  Similarly, in *Vega* itself, the Court applied a cost-benefit analysis to determine whether a *Miranda* violation could provide a cause of action under 42 U.S.C. § 1983.[72]  Finally, the Court in *Miranda*

---

[67] *Id.* at 507-12.

[68] *See id.*

[69] *Vega v. Tekoh*, 142 S. Ct. 2095, 2103 (2022).

[70] *New York v. Quarles*, 467 U.S. 649, 656.

[71] *See, e.g.*, *United States v. Lim*, 897 F.3d 673, 690-91 (5th Cir. 2018) (analyzing the *Quarles* public safety exception without discussing the rule's costs and benefits as applied in the case at hand); *United States v. Brathwaite*, 458 F.3d 376, 382 n.8 (5th Cir. 2006) (same); *United States v. Raborn*, 872 F.2d 589, 595 (5th Cir. 1989) (same).

[72] *Vega*, 142 S. Ct. at 2106-07.

No. 20-10999

weighed the costs and benefits when it determined that the *Miranda* warnings are required once a suspect is subject to custodial interrogation.[73]

The cost-benefit analysis that the concurring opinion says should occur in the present case threatens to displace our traditional inquiry entirely. It would in effect add a third inquiry so that on a case-by-case basis, courts could decide in a particular case whether the search for truth outweighs the prophylactic purpose of *Miranda*. That is a nigh impossible weighing task and one difficult to cabin in a principled and predictable way.

\*       \*       \*

I note that I am curious as to why the Government has appealed the suppression ruling in this case since statements Coulter made before he was handcuffed amount to an admission that officers would find a gun in his vehicle if they searched. But, we must resolve this appeal, and I would affirm the district court's ruling that suppressed all statements by Coulter after Officer Guzman handcuffed him.

---

[73] *Id.* at 2101-02 ("At no point in the [*Miranda*] opinion did the Court state that a violation of its new rules constituted a violation of the Fifth Amendment right against compelled self-incrimination. Instead, it claimed only that those rules were needed to safeguard that right during custodial interrogation."); *see also Miranda v. Arizona*, 384 U.S. 436, 444, 479-81 (1966).